

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-12-1998

# United States v. Kithcart

Precedential or Non-Precedential:

Docket 97-1168

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Kithcart" (1998). *1998 Decisions*. Paper 7.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/7

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 12, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1168

UNITED STATES OF AMERICA

v.

JESSE KITHCART,
        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. No. 96-00090-1)

Argued: August 11, 1997
Before: ALITO, LEWIS, and McKEE, Circuit Judges

(Opinion Filed January 12, 1998)

        David L. McColgin (Argued)
        Defender Association of
        Philadelphia
        Federal Court Division
        437 Chestnut Street
        Philadelphia, PA 19106

        Counsel for Appellant

        Howard L. Perzan (Argued)
        Suite 1250
        Office of United States
        Attorney
        615 Chestnut Street
        Philadelphia, PA 19106

        Counsel for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

Jesse Kithcart appeals from a judgment in a criminal case. Kithcart pled guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C.S 922(g)(1), but he reserved his right to appeal the district court's decision on his motion to suppress the firearm in question. This appeal raises the question whether the officers had probable cause to arrest and search Kithcart. Because we conclude that they did not have probable cause, we reverse the district court's denial of the suppression motion on the grounds given, and we remand for further proceedings in accordance with this opinion.

I.

On July 25, 1995, Bensalem Township Police Officer Teresa Nelson was assigned to a radio patrol car on the evening shift. Over the course of an hour, Officer Nelson received three radio transmissions, each reporting an armed robbery. The first two robberies occurred at motels in Bensalem Township, and the last transmission concerned a robbery in neighboring Bristol Township. The final report -- which was received at approximately 10:43 p.m. -- did not specify either the time or location of the Bristol robbery. Bristol is north of, and adjacent to, Bensalem Township.

The alleged perpetrators of these robberies were described as "two black males in a black sports car." It was also reported that one of the perpetrators might have been wearing white clothes, and the vehicle was described as a "possible Z-28, possible Camaro."[1]

At 10:53 p.m. -- approximately ten minutes after receiving the final radio transmission regarding the Bristol robbery -- Officer Nelson spotted a black Nissan 300ZX, which she described as a sports car, traveling south on

_____

1. The Z-28 is a type of Camaro.

2

Route 13, approximately a mile or less from the boundary of Bristol Township. The vehicle was driven by an African-American male who appeared to be the only person in the car. Officer Nelson testified that since the time when she received the first radio transmission more than an hour earlier, this was the first occasion when she spotted either a black vehicle or a black male driving a car. Officer Nelson also testified that immediately after she pulled up behind the vehicle, which had stopped at a red light, the driver drove the Nissan through the red light. Officer Nelson then flashed her dome lights, and the Nissan pulled over to the side of the road. At this point, Officer Nelson saw two sets of arms raised toward the roof of the car, and she realized that there were two people in the car.

Officer Nelson then called for backup and waited in her patrol car until Officers Christine Kellaher and Bill Williams arrived at the scene. Officer Williams found a gun in Kithcart's white nylon waist pouch, and Officer Kellaher found a gun under the driver's seat.

In moving to suppress the evidence seized by the police, Kithcart contended among other things, that the police lacked reasonable suspicion for an investigatory stop pursuant to Delaware v. Prouse, 440 U.S. 648 (1979), Terry v. Ohio, 392 U.S. 1 (1968), and related cases. See App. 95a. Consistent with this argument, Kithcart argued that Officer Williams had discovered his gun during a "pat down" or "frisk" but that the standard for conducting a "frisk" under Terry had not been met. App. 97a. The government argued that the police were justified in stopping the car because the driver ran a red light. In addition, the government's brief argued as follows:

> [G]iven that Officers Nelson and Williams were confronted with two black males in a black sports car shortly after and in the vicinity of the reported robberies, and that the males had attempted to flee upon seeing Officer Nelson's car pull behind theirs, the totality of the circumstances established reasonable suspicion to support the pat-down of the defendant and his waist-pack. See Chimel v. California, 395 U.S. 752, 763 (1969) (lawful arrest creates a situation which justifies a contemporaneous search of arrestee and

> immediate area, including area from within which arrestee might gain possession of a weapon); Terry v. Ohio, 392 U.S. 1 1968 (limited pat-down of a suspect's exterior clothing and protective sweep of area within immediate control are authorized during a lawful stop).

App. 107a-108a.

At the hearing on the motion, counsel for Kithcart, counsel for the government, and the court all referred to the government's latter argument as concerning the question of "probable cause" (see e.g., App. 27a, 28a, 54a, 58a), and at the conclusion of the hearing,[2] the district court orally ruled that the police had "probable cause . . . for the stop." App. 60a. The court relied on "the direction, the timing, the location of the vehicle, plus the fact it [was] a black sports car." App. 60a. The court noted the discrepancy between the radioed description of the perpetrators as two black males and Officer Nelson's initial belief that there was only one black male in the car, but the court held that the fact that Officer Nelson had not seen any other black men driving cars since she received the initial radio transmission heightened the probability that the driver of the vehicle had been involved in the robberies. Because the court concluded that the officers had probable cause, the court found it unnecessary to decide whether the alleged running of the red light provided an independent basis for Officer Nelson's stop and the subsequent actions of the officers.

Following this ruling, Kithcart pled guilty, subject to the condition that he be allowed to challenge on appeal the district court's denial of his motion to suppress.

_____

2. Officer Nelson testified at the hearing. Officers Kellaher and Williams did not testify. Officer Nelson's account of the traffic violation was disputed by the defense. Co-defendant Carl Green-- the driver of the car and a cooperating witness against Kithcart -- told the government that he had not driven through a red light prior to the stop by Officer Nelson. The district court did not resolve this issue, relying instead on its finding
that there was probable cause to arrest and search based on the radio transmissions.

4

II.

We turn first to the ground on which we understand the district court to have denied Kithcart's suppression motion, viz., that the officers had "probable cause" to arrest Kithcart and to search him incident to the arrest. When a warrantless search is made pursuant to an arrest, "[t]he constitutional validity of the search . . . must depend upon the constitutional validity of the . . . arrest." Beck v. Ohio, 379 U.S. 89, 91 (1964).

> Whether that [warrantless] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it -- whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.

Id. See also Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994) (test for probable cause is objective test: did the police officer have a reasonable basis for believing that the suspect had committed or was committing a crime). Our review of a district court's determination that there was probable cause to effect a warrantless search is de novo. Ornelas v. United States, 116 S. Ct. 1657, 1659 (1996).

Based on the standard set by the Supreme Court in Beck, the district court erred in concluding that there was probable cause to arrest and search Kithcart prior to the discovery of the guns. The mere fact that Kithcart is black and the perpetrators had been described as two black males is plainly insufficient. As we have previously noted, a description of " `two negro males' and two `black males' . . . without more . . . would not have been sufficient to provide probable cause to arrest [the suspect]." Edwards v. City of Philadelphia, 860 F.2d 568, 571 n.2 (3d Cir. 1988). Moreover, the match between the description of the perpetrators' car (a black sports car, "possible Z-28, possible Camaro)" and the vehicle in which Kithcart was spotted (a black Nissan 300ZX) was far from precise. Although the Camaro Z-28 and the Nissan 300ZX could be

5

considered "sports cars," there was no evidence offered at the suppression hearing that the shapes of the two cars were sufficiently similar so as to warrant an inference that a 300ZX could be mistaken for a Z-28.

Nor is probable cause established by either the location or time of the stop. There was no evidence presented as to where in Bristol Township the final robbery occurred; nor was there evidence presented that the Bristol robbery occurred shortly before Officer Nelson stopped the car carrying Kithcart. Although the radio transmission regarding the Bristol robbery came approximately 10 minutes before the vehicle was stopped, Officer Nelson testified that she did not recall that the radio transmission revealed when the Bristol robbery occurred, other than that it occurred that same evening. Compare Edwards, 860 F.2d at 571 n.2 (although the description "two negro males" was insufficient by itself to provide probable cause to arrest suspect, other evidence closely linking suspect to scene of reported crime was sufficient). In sum, we think that it is clear that the facts and circumstances within Officer Nelson's knowledge at the time she stopped the Nissan were insufficient to allow a prudent person to believe that the car and its occupants had committed or were committing an offense. In other words, armed with information that two black males driving a black sports car were believed to have committed three robberies in the area some relatively short time earlier, Officer Nelson could not justifiably arrest any African-American man who happened to drive by in any type of black sports car.

III.

The finding of no probable cause, however, does not end the inquiry. In Terry v. Ohio, supra, the Supreme Court held that law enforcement officers may stop and temporarily detain persons short of arrest without violating the Fourth Amendment. A Terry stop is justified when an officer has a reasonable suspicion that "criminal activity may be afoot." Id. at 30. The officer's suspicion must be based on articulable facts and not merely the officer's subjective good faith. Id. at 21. An officer may also conduct a "reasonable search for weapons for the protection of the

6

police officer, where he has reason to believe that he is dealing with an armed and dangerous individual . . .." Id. at 27. The test is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. As noted, this question was briefed by the parties in the district court, but the district court did not base its decision on this ground.

On remand, the district court should examine whether Officer Nelson had a reasonable suspicion sufficient to warrant an investigative stop. The court should consider both of the government's asserted grounds for the stop: (1) the alleged traffic infraction and (2) the information regarding the armed robbery suspects discussed in Section II, infra. The district court should also consider whether the events leading to the discovery of the weapon in Kithcart's pouch can be justified as a Terry "pat-down" We offer no opinion at this juncture on any of these questions.

IV.

For the foregoing reasons, we conclude that the district court erred in finding that Officer Nelson had probable cause to arrest and search Kithcart. We therefore reverse the denial of the suppression motion and remand for further proceedings to consider whether the officers had reasonable suspicion for an investigative stop and weapons search of Kithcart's person.

McKEE, Circuit Judge, dissenting in part, and concurring in part.

I agree with the majority's conclusion that the prosecution did not establish that Officer Nelson had probable cause to arrest the defendant. However, the same testimony that requires us to reverse the district court's determination that the government had probable cause also establishes that Officer Nelson did not have reasonable suspicion to stop and detain the occupants of the car. Therefore, I disagree with the majority's decision to remand this matter so that the district court can determine if the stop was authorized under Terry v. Ohio, 392 U.S. 1 (1968). It clearly was not, and I would so rule as a matter of law. Thus, I dissent from that portion of the opinion that allows reconsideration under Terry on remand.

I.

Terry v. Ohio created a very limited exception to the general warrant requirement of the Fourth Amendment to the United States Constitution. See 392 U.S. at 21. Although Terry allows an investigative stop, it still requires reasonable suspicion before the government can justify even this limited intrusion. "It is well established that an investigatory stop short of an arrest is valid based upon a reasonable suspicion that criminal activity is afoot." United States v. Rickus, 737 F.2d 360, 365 (3d Cir. 1994) "Reasonable suspicion must be based upon `specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion.' " Id. (quoting Terry, 392 U.S. at 21).

This record establishes only that three armed robberies had occurred -- two in Bensalem Township and one in Bristol -- sometime during the evening of July 25, 1995, and that two Black males in a black sports car that was probably a Camero Z28 were involved. Officer Nelson did not know which direction nor road the car was last reported traveling. Although the car in which the defendant was riding was a black sports car, it was not a Camero Z28. Rather, the defendant was traveling in a Nissan Model 300ZX. As the majority correctly notes, the record contains

8

no evidence that these two cars are so similar that they can easily be confused with each other or that Officer Nelson believed the Nissan to be a Camero. Officer Nelson's focus was not on a particular model sports car. Instead, it was on the color of the sports car and the race of its occupants.

The car that Officer Nelson stopped was not only a different make and model than the one most likely involved with the armed robberies, but the number of occupants it contained appeared to be inconsistent with the radio broadcast as well. The majority points out that it was only after Officer Nelson initiated the stop and saw a second pair of hands go into the air that she realized that the car did in fact contain two males.[1] At the suppression hearing, Officer Nelson was asked, "from the time you pulled directly behind the vehicle and the time you pulled the vehicle over, you thought initially that there was one black male in that vehicle?" She answered: "Correct." App. 47a. Therefore, disregarding the allegation of a traffic violation, Officer Nelson stopped this car solely because it was a black sports car driven by an African American male near Bristol Township shortly after she learned that two African American males had committed a series of armed robberies in that area. Based on this record, the majority correctly concludes that "Officer Nelson could not justifiably arrest any African American man who happened to drive by in any type of black sports car." Majority Op. at 6. However, the majority then allows the government an opportunity to establish that Officer Nelson's stop was appropriate under Terry v. Ohio, rather than following the obvious extension of its own logic. Just as this record fails to establish that Officer Nelson had probable cause to arrest any Black male who happened to drive by in a black sports car, it also fails to establish reasonable suspicion to justify stopping any and all such cars that happened to contain a Black male. See Terry, 392 U.S. at 30.

The majority states "on remand the district court should examine whether Officer Nelson had a reasonable suspicion sufficient to warrant an investigative stop." Majority Op. at

_____

1. I do not mean to suggest that Officer Nelson would have been justified in stopping this Nissan even if she had seen the passenger.

9

7. However, it is clear that she did not. "In determining whether a stop is justified, the court must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers." Rickus, 737 F2d at 365. The district court explained the discrepancy between the radio broadcast of two Black males and Officer Nelson's observation of a different model black sports car containing only one Black male as follows:

> Now, the issue of one black male versus two black males. She testified that she had not seen cars driven by other black males for the time she had been looking, and she sees a black sports car driven by one black male. I do believe its still supported by probable cause that there is another black male in the car, or that perhaps they had split up or whatever.

> But even so, I think the probable cause is heightened by the fact that she had not seen a lot of cars driven by black males in this area. . . .

App. at 60a.

However, there is nothing on this record to suggest that the perpetrators "had split up" following the robbery, or that someone other than the driver was in the car when Officer Nelson stopped it. Unsupported conjecture of this type would allow a stop of a car containing any number of Black males as one could always speculate that the car stopped and perpetrators got in or out of the car. This speculation renders the radio information regarding the number of suspects irrelevant and allows police officers to stop any Black person riding in any car that is"similar" to one involved in a crime even where, as here, that car does not match the likely description that has been broadcast on police radio. Conclusions based upon possibilities, no matter how remote or speculative, are inconsistent with the need to justify an investigative stop with reasonable suspicion based upon specific and articulable facts. Accordingly, any attempt to justify the instant stop under Terry would elevate speculation and conjecture to the level of articulable facts.

> [T]he types of articulable facts that can provide reasonable suspicion cannot include `circumstances

10

[which] describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures' were the circumstances accepted as reasons for the investigation.

Karnes v. Skrutski, 62 F.3d 485, 492 (3d Cir. 1995) (quoting Reid v. Georgia, 448 U.S. 438 (1980)). That is what happened here. Absent a traffic violation, Officer Nelson's stop is little more than a random stop of an African American male in a black sports car.

II.

Although I agree that it would normally be important to determine if the car that was stopped went through a red light, I question the propriety of allowing that inquiry in this case. At the beginning of the suppression hearing, an issue arose as to Officer Nelson's credibility. The prosecutor stated that he was going to call Officer Nelson, and that she was going to testify that the driver of the car in which defendant was riding disregarded a red light when she pulled up behind the car. The prosecutor also informed the district court that Carl Green, the driver of that car, had already entered a guilty plea in front of a different judge. As part of his plea agreement, Green had agreed to "cooperate, and provide truthful testimony" in the government's prosecution of Kithcart. App. at 13a. Although Green's testimony apparently implicated Green in the armed robberies, the government stipulated that if he were called to testify at Kithcart's suppression hearing, Green would testify that he did not go through the red light when Officer Nelson pulled up behind his car.

> Essentially the bottom line is, that Carl Green, if called to testify at this hearing, would say that it was his recollection that he did not go through a red light immediately prior to being stopped by Officer Nelson.
>
> And I discussed this matter with [defense counsel] and he felt that if the government would enter into a stipulation that it would be Mr. Green's testimony, that there would be no need to have Mr. Green as a witness in the hearing and that Police Officer Nelson's

11

testimony would be the only evidence the government would put forward.

App. at 22a.

However, the district court was justifiably concerned about making a credibility determination that required it to judge the live testimony of Officer Nelson against contradicting testimony that was to be admitted by way of stipulation. The court told defense counsel:

> I guess the problem I have is that you want me to assess credibility, and you want me to do it in a vacuum. In other words, assess this police officer's credibility compared to nothing, compared to the fact that Mr. Green wouldn't be testifying, but that he would say. And yet for the purpose of credibility, that makes it very difficult, are you certain this is the way you want me to proceed?

App. at 25a.

The government responded that its position was that Officer Nelson had reasonable suspicion when she pulled up behind Green's car, but that the government's argument was two prong. The government argued that the car was stopped for a traffic violation but, regardless of the alleged violation, Officer Nelson still had reasonable suspicion to stop the car based upon the radio transmissions she received regarding armed robberies in a neighboring township. App. at 26a. The prosecutor stated "even if your Honor were to discount . . . Officer Nelson's testimony [about the traffic violation] in its entirety, there was still reasonable suspicion" to stop the car. App. at 26a. No doubt out of a desire to adjudicate this case fairly and expeditiously, the district court agreed to hear Green's testimony outside the presence of the jury during the course of his trial testimony and to reserve any issue of credibility until that point. This would have allowed the trial to proceed while still affording both sides a fair opportunity to litigate the credibility issues that related to the suppression motion. The court then reemphasized:"I would be very reluctant to make a decision without hearing from [Green]." The trial judge told the prosecutor, "I believe the ball is in your court." App. at 29a. Almost immediately

12

thereafter, the government called Officer Nelson to testify about the circumstances leading up to the arrest of the defendant. However, at the conclusion of Officer Nelson's testimony the district court upheld the arrest based upon its belief that Officer Nelson's testimony established probable cause regardless of any traffic violation, and the defendant entered his conditional guilty plea immediately thereafter. Accordingly, the matter never proceeded to trial, and the district court never had an opportunity to hear Green's testimony and make a finding of fact about the alleged traffic violation.

Officer Nelson would clearly have been justified in stopping Green's car to enforce the traffic laws if Green drove through a red light. See United States v. Moorefield, 111 F.3d 10, 12 (3d. Cir. 1997) ("It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the sate traffic regulations."). The police would also have been justified in ordering Green and Kithcart out of the car if that is what happened. See Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (concluding that ordering a driver out of the car after a traffic violation is a justifiable, de minimis intrusion). However, the record does not allow a court to determine what happened after the car was stopped. The prosecutor apparently thought that the gun that was seized from Kithcart would automatically be admitted if he established the legality of the initial stop. However, the traffic violation would not necessarily allow the prosecution to admit the gun into evidence merely because it justified the traffic stop. This record is devoid of evidence to support a conclusion that any search of Kithcart's person after the stop was reasonable under the Fourth Amendment.

The prosecution informed the district court that the only evidence it planned to present during the suppression hearing was Officer Nelson's testimony. The following exchange occurred during that testimony:

> Q. Did any officer recover a gun from the defendant, Jesse Kithcart?
>
> A. Yes.
>
> Q. Who was that?

        A. That was Officer Bill Williams.

* * *

        Q. I was given [by Officer Williams] a 32 revolver and
        I was given a white nylon pouch.

        Q. Have you spoken to Officer Williams about where
        they recovered the gun from Mr. Kithcart?

        A. Yes.

        Q. What did Officer Williams say?

        A. Officer Williams stated to me that the gun was
        recovered from the nylon pouch.

        Q. And where was the nylon pouch?

        A. It was on Mr. Kithcart's waist.

App. at 40a–41a. The prosecution never planned to call
Officer Williams, or any other witness, (other than Carl
Green) and there is nothing to suggest that additional
testimony was unavailable. Officer Nelson neither searched
the car nor the seized weapon in question. She may have
seen other officers conduct the search and/or seize the
gun, but that was not her testimony. There is nothing on
this record to inform the suppression court whether
Kithcart's gun was discovered during a pat down search or
whether it was in plain view – though inside the pouch. The
fact finder must guess about how the gun was seized and
any basis for the reasonable suspicion that may have been
necessary to justify the seizure.2

I appreciate that any police officer approaching this car
would be apprehensive. That is true whether or not the
driver had gone through a red light. Indeed, the normal
experience of a police officer would dictate caution in
approaching any stopped car whether or not the officer
believed the car to contain armed suspects. "The Supreme
Court has repeatedly recognized that traffic stops are
dangerous encounters that result in assaults and murders

_____

2. There were several police officers on the scene, and it is unclear
whether Officer Williams seized the gun from Kithcart, or if he merely
received it from another officer and gave it to Officer Nelson.

14

of police officers." Moorefield. 111 F.3d at 13. (internal quotation marks and citations omitted). However, although the exigencies and dangers that are endemic to any such confrontation are part of the analysis of whether the resulting intrusion is "reasonable" under the Fourth Amendment, they do not remove all of the protection afforded under it. Accordingly, a police officer can conduct a pat down search of the occupants of a stopped car"where the officer is `able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " Id. (quoting Terry, 392 U.S. at 27). The reasonable inferences that arise from the circumstances of a traffic stop are such that it does not require a "leap of faith" to conclude that the instant seizure was justified if there was a traffic violation. However, the interests protected by the Fourth Amendment are too important to allow Officer Nelson's testimony to bridge the void in this record. The prosecutor here made no effort to have an appropriate witness articulate the circumstances surrounding the seizure of the gun. Accordingly, I am reluctant to assume that the government should now be allowed to produce a witness on remand that it should have, and could have, called during the initial suppression hearing.

I would leave it to the trial court's discretion to decide whether the prosecutor should be allowed to produce the testimony that I think is needed to bridge the interstices in this transcript. That court will be in the best position to determine whether or not the government should be allowed a second the bite of the Terry apple by producing testimony beyond that which is necessary to rule upon the issue of the alleged traffic violation. If there was no traffic violation, Officer Nelson was not justified in stopping the car in which Kithcart was riding. If the suppression court concludes that there was a traffic violation, then it should determine the propriety of allowing testimony regarding the circumstances of the seizure after considering any explanation as to why that testimony was not produced initially.

I do not think it is asking too much to expect attorneys to attempt to meet their burdens of proof when issues are

15

first litigated. A court should not have to connect the dots of inferences scattered as far apart as the ones on this record to construct a picture of what occurred during the stop. Accordingly, although I join the majority opinion insofar as it reverses the order of the district court, I must, however, respectfully dissent from the remainder of my colleagues' opinion.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit