Thomas v. Gscheidle                    CV-98-264-JD  05/26/99

UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


Lennie Thomas
and Cushaw Barnett

        v.                            Civil No. 98-264-JD

Peter Gscheidle, et al.


                        O R D E R


     Plaintiffs Lennie Thomas and Cushaw Barnett bring civil
rights and state law claims against two Kittery police officers,
Peter Gscheidle and Robert Gagne, the chief of the Kittery police
department, Edward Strong, and the town of Kittery, Maine.  The
plaintiffs' claims arise from a sequence of events during which
their car was stopped and they were subjected to a full felony
stop before being released.  The defendants move for summary
judgment (document no. 11) on all claims.


                        Background

     On March 25, 1997, Kittery Police Officer Peter Gscheidle
and Animal Control Officer Robert Gagne traveled to New Hampshire
to pick up a Kittery police cruiser that had been repaired in
Newington, New Hampshire.  Before he left Maine that day,
Gscheidle had briefly seen a bulletin received by the Kittery
Police Department from the York County (Maine) Sheriff's

Department.  From the bulletin, dated four days earlier, Gscheidle learned that two young black male suspects, in their early twenties, were wanted in New York City for homicide and at least one of them had been seen in the Biddeford, Maine, area. The pictures of the two suspects in the bulletin were not very good, providing no distinguishing characteristics.  The bulletin said that the suspects were likely to be armed with nine millimeter handguns and were considered dangerous.

As Gscheidle and Gagne came through the Portsmouth traffic circle, they saw two cars beside the road.  The plaintiffs had been involved in a minor traffic accident with a second car. Cushaw Barnett and the driver of the other car concluded that there was no damage or injuries, and they were about to leave when Gscheidle and Gagne stopped behind them.  Officer Gscheidle spoke with the driver of the other car, who said she was in a hurry, but he did not speak to or identify either of the plaintiffs, Cushaw Barnett or Lennie Thomas, who were in their car for most of the time.  Barnett, who was the driver, got out briefly to write something down.  Thomas, the passenger, repeatedly turned around to watch the activity of the police.

The two cars and the police left the area of the accident. Barnett and Thomas, who were in a green Jetta Volkswagen, turned northbound on the Spaulding Turnpike as did Gscheidle and Gagne

2

on their way to the repair shop in Newington.  As the green Jetta left, Gscheidle and Gagne say they saw Thomas slide down in his seat as if trying to be less visible to the officers, and they noticed Barnett continually looking in his rear view mirror to see what the police cruiser was doing.

Gscheidle radioed to the Portsmouth Police Department to report the minor accident.  Gscheidle also reported that the two young black men in one of the cars involved in the accident matched the descriptions of two men wanted for questioning in York County, Maine, for a double homicide in New York City.  He may also have told the Portsmouth police that they were driving a car that matched the description of the suspects' car.  Officer David Whewell of the Portsmouth police responded and stopped Barnett and Thomas on the Spaulding Turnpike in Newington, New Hampshire.  Officers Gscheidle and Gagne, who were following, also stopped and got out of their cruiser with their guns drawn. Newington police officers soon arrived and assisted in the stop. Within minutes a television camera crew also arrived in their truck.

Officer Whewell and the Newington officers treated the situation as a felony motor vehicle stop.  Barnett and Thomas were ordered out of the car one at a time and were handcuffed. They allege that they were forced to lie on the ground with the

3

officers' guns drawn and pointed at them. Barnett produced identification, but Thomas did not have identification with him. Thomas gave his name as Lennie Edward Thomas while Barnett identified him as Ramal Shink. New Hampshire State Police troopers arrived and decided to take Thomas to the Newington police station to confirm his identity. Thomas's baby son, riding in a car seat in the back seat of the Jetta, was released to Barnett's custody.

At the station, Newington officers talked with Thomas and were satisfied as to his identity. An officer contacted the Kittery police department to get a copy of the bulletin for the two suspects wanted for homicide. Once the copy arrived, the officer called the New York City Police Department and learned that the suspects were then believed to be in South Carolina. Thomas was released.

## Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must first demonstrate the absence of a

4

genuine issue of material fact in the record.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The record evidence is taken in the light most favorable to the nonmoving party.  <u>Zambrana-Marrero v. Suarez-Cruz</u>, No. 98-1601, 1999 WL 223066, *2 (1st Cir. April 21, 1999).  All reasonable inferences and credibility issues are resolved in favor of the nonmoving party.  <u>Barreto-Rivera v. Medina-Vargas</u>, 168 F.3d 42, 45 (1st Cir. 1999).

"An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor, while a fact is only 'material' if it has the potential to affect the outcome of the suit under the applicable law."  <u>Bourque v. F.D.I.C.</u>, 42 F.3d 704, 707-08 (1st Cir. 1994) (quotations omitted).  Summary judgment will not be granted as long as a reasonable jury could return a verdict in favor of the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

<u>Discussion</u>

The plaintiffs bring federal claims under 42 U.S.C.A. § 1983 for violation of their Fourth Amendment and Fourteenth Amendment rights, under sections 1981 and 1983 for race discrimination, and under section 1983 for a conspiracy to violate their civil

5

rights.[1]  In addition, the plaintiffs cite provisions of the New Hampshire Constitution in support of their federal claims.  They allege municipal and supervisory liability.  The plaintiffs also allege state law claims for invasion of privacy, assault and battery, and negligence.  The defendants move for summary judgment arguing that the plaintiffs have not stated due process claims under the Fourteenth Amendment, that section 1981 provides no separate cause of action in a case brought pursuant to 42 U.S.C.A. § 1983, that they are entitled to qualified immunity, and that the plaintiffs' state law claims fail on the same grounds as the federal claims or for lack of jurisdiction once summary judgment is granted on the federal claims.

A.    Due Process Claims

As the defendants contend, claims that a plaintiff was stopped or arrested without probable cause or that excessive force was used in a stop or an arrest are specifically addressed by the Fourth Amendment and are not subject to a substantive due process analysis under the Fourteenth Amendment.  See Albright v. Oliver, 510 U.S. 266, 273, 276, 288 n.2 (1994); Graham v. Connor,

---

[1]Although the complaint also cites 42 U.S.C.A. § 1982, the court understands the reference to § 1982 to be an error as neither party has mentioned that section, and § 1982 does not seem to apply to the facts alleged in this case.

6

490 U.S. 386, 395 (1989).  Only abusive and arbitrary governmental actions that are <u>not</u> specifically governed by a particular constitutional right may be actionable as a violation of substantive due process.  <u>See</u> <u>County of Sacramento v. Lewis</u>, 118 S. Ct. 1708, 1714-16 (1998).

In this case, the plaintiffs allege due process claims "for unlawful search, unreasonable force, unlawful arrest or other seizure," which they also allege as violations of the Fourth Amendment.  <u>See</u> Plaintiffs' Memorandum at 6.  Since those claims are specifically addressed by the Fourth Amendment, a substantive due process analysis does not apply.  The plaintiffs have not identified any other claims or conduct by the defendants that would be governed by a substantive due process analysis rather than the Fourth Amendment.  <u>Cf.</u> <u>Lewis</u>, 118 S. Ct. at 1715-16 (police pursuit before seizure not covered by Fourth Amendment and therefore analyzed under substantive due process).  The defendants are entitled to summary judgment with respect to plaintiffs' claims based on alleged violations of substantive due process in counts one, three, and four.

B.  <u>Discrimination Claims</u>

In count two, the plaintiffs allege racial discrimination and bring claims under 42 U.S.C.A. § 1981 and § 1983.  The

7

defendants contend that the claims under section 1981 must be dismissed based on the holding in Jett v. Dallas Independent Sch. Dist., 491 U.S. 701, 735 (1989), that section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." The defendants, however, did not address the effect of the 1991 amendment of section 1981, which added subsection (c), on the exclusive remedy holding in Jett. See, e.g., Federation of African American Contractors v. Oakland, 96 F.3d 1204, 1206-08 (9th Cir. 1996); Meachum v. Temple Univ., No. 97-1629, 1999 WL 183675 *6, n.7 (E.D.Pa. March 25, 1999); Webster v. Fulton County, No. 96CV2399TWT, 1999 WL 266460, *21-23 (N.D.Ga. Feb. 12, 1999); Tabor v. Chicago, 10 F. Supp. 2d 988, 992 (N.D. Ill. 1998). The plaintiffs rely on Alexis v. McDonald's Restaurant, 67 F.3d 341, 348 (1st Cir. 1995), which held that a section 1981(a) cause of action could be brought against a police officer, without reference to either Jett or the 1991 amendments. Since the defendants have not demonstrated, on the record presented here, that they are entitled to judgment as a matter of law on the issue of a separate cause of action under section 1981, the motion is denied as to that claim.

C. Qualified Immunity

"Under the doctrine of qualified immunity, public officials 'generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" El Dia, Inc. v. Rossello, 165 F.3d 106, 109 (1st Cir. 1999) (quoting Harlow v. Fitzgerald, 457 U.S. 335, 343 (1986)). Qualified immunity is determined based on the right defined at an appropriate level of generality in the context of the totality of the circumstances. Camilo-Robles v. Zapata, No. 98-1590, 1999 WL 223051 at *2 (1st Cir. Apr. 20, 1999). The qualified immunity inquiry is objective, based on the actions of a reasonable person, so that "[e]vidence concerning the defendant's subjective intent is simply irrelevant to that defense." Crawford-El v. Britton, 118 S. Ct. 1584, 1592 (1998). Once a defendant has properly raised qualified immunity as an affirmative defense, the plaintiff bears the burden of rebutting the defense. See id. at at 1591-92; Pierce v. Smith, 117 F.3d 866, 871-72 (5th Cir. 1997); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992) ("When a defendant moves for summary judgment on the basis of qualified immunity, it is the plaintiff's burden to demonstrate the infringement of a federally assured right.").

The first step in the qualified immunity analysis is to

9

determine whether the plaintiff has alleged the deprivation of a constitutional right at all. <u>Sacramento v. Lewis</u>, 118 S. Ct. 1708, 1714 n.5 (1998). The plaintiffs allege that they were stopped without probable cause or reasonable suspicion, because they are African American males, and that they were subjected to an excessive use of force in the course of the stop in violation of the Fourth Amendment.

Probable cause to arrest "exists when the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." <u>Rivera v. Murphy</u>, 979 F.2d 259, 263 (1st Cir. 1992) (quotations omitted). Probable cause for an investigative stop requires that "a police officer have 'specific and articulable facts which, taken together with rational inferences from those facts,' could create a reasonable suspicion sufficient to justify a brief detention of an individual." <u>Id.</u> at 264 (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968)).

The bulletin that Gscheidle saw described two African American men in their twenties and provided indistinct photographs of the men. No other distinguishing information was provided. The bulletin was four days old on March 25 when

10

Gscheidle saw it.

Gscheidle saw the plaintiffs at the site of the accident and noted that Barnett, the driver, had exchanged information with the other driver, and got out of his car again while the officers were present to write something down. Gscheidle and Gagne saw Thomas, the passenger, looking at the cruiser to see what was going on. Neither Gscheidle nor Gagne questioned the plaintiffs at the scene of the accident or made any effort to identify them. Both the cars and the cruiser left at about the same time.

Only after the cruiser was following the plaintiffs did the officers notice that Thomas was slipping down in his seat, which they now describe as suspicious behavior because he appeared to be trying to make it look like there was only one person in the car. That is an improbable inference given the fact that the officers saw Thomas in the car at the scene of the accident where he apparently made no effort to hide. The officers also found it suspicious that Barnett repeatedly looked in the mirror at the cruiser following him. However, this is not an unusual response for a driver who is being followed by a cruiser. Therefore, the only remaining basis for the officers' conclusion that the plaintiffs were the suspects described in the bulletin was their race, gender, and that there were two of them. That information alone, under the circumstances, was insufficient to support

11

either probable cause or a reasonable suspicion to stop them. See, e.g., United States v. Kithcart, 134 F.3d 529 (3d Cir. 1998); Washington v. Lambert, 98 F.3d 1181, 1190-91 (9th Cir. 1996); Whitfield v. Board of County Comm'rs, 837 F. Supp. 338, 344 (D. Colo. 1993).

On the present record, Gscheidle and Gagne did not have probable cause to believe that the plaintiffs were the homicide suspects. To the extent they participated in the stop and used force in the stop, they acted without probable cause in violation of the plaintiffs' Fourth Amendment rights.[2] A free citizen's Fourth Amendment right not to be stopped or arrested without probable cause and not to be subjected to unreasonable force in the course of a stop or arrest was clearly established in 1997 when these events occurred. See, e.g., Graham, 490 U.S. at 394; Vargas-Badillo v. Diaz-Torres, 114 F.3d 3, 5 (1st Cir. 1997); Rivera, 979 F.2d at 264. Gscheidle's conduct in this case is readily distinguishable from cases where the police have probable cause to arrest, but mistakenly arrest the wrong person. See, e.g., Hill v. California, 401 U.S. 797, 802 (1971); Dean v.

---

[2]The parties have not distinguished actions of Gagne from Gscheidle during the events in question. From the record presented, it seems that Gagne had no independent knowledge of the bulletin or the descriptions of the suspects and instead relied on Gscheidle's reports and conclusions. However, since qualified immunity is not argued as to Gagne's role individually, the court will not, sua sponte, separate the two defendants.

<u>Worcester</u>, 924 F.2d 364, 368 (1st Cir. 1991). In the absence of probable cause or reasonable suspicion that the plaintiffs were the homicide suspects, then to the extent Gscheidle and Gagne used force in the process of the stop, it was unreasonable. <u>See</u> <u>Graham</u>, 490 U.S. at 394.

The defendants argue that because they did not personally effect the stop, the plaintiffs cannot show that they violated the Fourth Amendment. Based on the record presented, it seems that Officer Whewell of the Portsmouth police, rather than Officers Gscheidle and Gagne, stopped the plaintiffs.[3] The plaintiffs do not contest Officer Whewell's grounds to stop them. Whewell's stop, however, was initiated by and based on Gscheidle's report that the plaintiffs matched the descriptions of two suspects wanted for a double homicide in New York. Gscheidle's report to the Portsmouth police, as transcribed in Whewell's report, that the plaintiffs matched the description of the suspects and that their car "sort of fit the description" in the bulletin seems to have been misleading or false, since Gscheidle had insufficient information to draw that conclusion.

---

[3]The plaintiffs argue that Gscheidle and Gagne participated in the stop. The facts in the record presented show that they provided backup support to Whewell after he stopped the plaintiffs' car.

13

In addition, in making the report, he intended the information to be used by the Portsmouth police to stop or arrest the plaintiffs.

In a qualified immunity analysis, the right affected must be considered at an appropriate level of generality because "the focus must be upon the particular conduct engaged in by (or attributed to) the defendants; immunity is forfeited only if a reasonable official would clearly understand that conduct to be a violation of the Constitution." Rivera-Ramos v. Roman, 156 F.3d 276, 279 (1st Cir. 1998). Here, the parties have not sufficiently addressed the defendants' particular conduct in the context of the alleged violations of the plaintiffs' Fourth Amendment rights. Cf., e.g., Devose v. Addison, 172 F.3d 632 (8th Cir. 1999); Aponte Matos v. Toldeo Davila, 135 F.3d 182, 187 (1st Cir. 1998); Phelan v. Thompson, 889 F. Supp. 517, 519 (D.N.H. 1994). For that reason, both factual and legal issues remain that cannot be resolved on the present record.

D. Municipal and Supervisory Liability

Count three in each complaint is titled "Municipal Liability/Respondeat Superior." Both allege that the town was "grossly negligent or deliberately indifferent in the training or instruction of police officers," and are brought under 42

14

U.S.C.A. § 1983.  Count four in each complaint is titled "Supervisory Liability."  The supervisory liability claims allege that the town and Chief Strong "failed, neglected or refused" to manage and supervise the defendant officers with respect to probable cause to arrest and search, use of force, race discrimination, and the constitutional rights of citizens, and "tolerated or acquiesced in the misuse of police powers" with "reckless disregard" or "deliberate indifference" to the plaintiffs' constitutional rights.  The supervisory liability claims are also brought pursuant to section 1983.

The town and Chief Strong assert that respondeat superior is not a viable basis for a section 1983 claim and contend that the plaintiffs have no evidence to prove their municipal and supervisory liability claims under the appropriate standards. The plaintiffs acknowledge that respondeat superior is not actionable under section 1983, but explain that the respondeat superior theory was intended to apply only to their state law claims.

1.  Municipal liability.

To establish municipal liability under section 1983, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Board of County Comm'rs. of

15

<u>Bryan County v. Brown</u>, 520 U.S. 397, 402 (1997).  A municipal policy may be established by the municipality's "duly constituted legislative body" or by the decisions of a policymaker.  <u>Silva v. Worden</u>, 130 F.3d 26, 30 (1st Cir. 1997).  A custom or practice must have been "so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1156 (1st Cir. 1989).  The causation element requires that the policy or custom be the moving force behind the constitutional injury so that the municipality caused the injury by its deliberate conduct.  <u>Swain v. Spinney</u>, 117 F.3d 1, 10 (1st Cir. 1997).  Deliberate indifference is the "standard of culpability sufficient to identify a dereliction as reflective of municipal policy."  <u>Sacramento</u>, 118 S. Ct. at 1717 n.10.

In this case, the custom or policy at issue is the town's alleged failure to adequately train its police officers to recognize suspects identified in police bulletins and to make stops based on probable cause.[4]  The plaintiffs have not shown that the town had a policy not to train with respect to police

_____

[4]Although the plaintiffs may have alleged a broader policy, they address only a lack of training in opposition to summary judgment.

16

bulletins and identifying suspects.  The only evidence of a custom or practice pertaining to training is evidence from Gscheidle's deposition of his lack of training with respect to using bulletins and identifying suspects in the context of race.  His experience alone does not demonstrate that the town had a custom or practice not to train police in using bulletins and identifying suspects.

In addition, the plaintiffs have not established that the town's alleged policy or custom not to train its police officers was the result of a conscious choice among training alternatives that shows a deliberate indifference to the rights of those who would be affected.  See Canton v. Harris, 489 U.S. 378, 388-89 (1989).  There is also no reference to the record to support the plaintiffs' statement that as a result of a lack of training, "all blacks looked alike, or were potential criminals" to Gscheidle or any of the town's police.  See Plaintiffs' Memorandum at 22.  The record does not show that the town was aware of or should have been aware of problems caused by a lack of training in using bulletins and identifying suspects.  The plaintiffs, therefore, have not shown a factual dispute as to the existence of a town policy or custom that caused their injury due to the town's deliberate indifference to their constitutional rights.

17

2. <u>Supervisory liability.</u>

The plaintiffs do not specifically address supervisory liability, instead asserting that the defendants failed to distinguish municipal from supervisory liability, and for that reason, the defendants are not entitled to summary judgment as to their claim of supervisory liability. Since the defendants raised supervisory liability at pages 22 through 24 of their memorandum, the plaintiffs appear to be mistaken.

Supervisors, such as Chief Strong, may be liable for the constitutional violations caused by police officers under their supervision if the supervisor was either the "primary actor involved in, or a prime mover behind, the underlying violation." <u>Camilo-Robles v. Zapata</u>, No. 98-1590, 1999 WL 223051 at *2 (1st Cir. Apr. 20, 1999). Supervisory liability is based upon the supervisor's own actions or omissions including the foreseeable consequences of subordinates' misconduct if the supervisor "'would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it.'" <u>Barreto-Rivera</u>, 168 F.3d at 48 (quoting <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 582 (1st Cir. 1994)). A plaintiff must show an affirmative link, such as a policy or prior notice of violative conduct, between the supervisor's action or omission and the constitutional

18

deprivation alleged.  Id.; see also Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998).

Although the plaintiffs say that "Chief Strong's policy and training was to allow their officers unfettered discretion in determining reasonable suspicion, or at least to make an investigatory stop based on scant information," the plaintiffs' references to the record do not support the statement.  In addition, Gscheidle's description of his police training provided in his affidavit demonstrates that he was trained in criminal investigation, investigatory stops and arrests, the legal bases for arrest, and the use of force.  The plaintiffs also make an unsubstantiated statement suggesting racial bias in police activity.  Since the plaintiffs' allegation is not supported in the record, it will not be considered.

As the plaintiffs provide no factual support to show that Chief Strong or the town played any role in the events that led to their stop, they have not shown a trialworthy issue with respect to a theory of supervisory liability.  Chief Strong and the town are entitled to summary judgment as to the plaintiffs' section 1983 claims.

E.  <u>State Law Claims</u>

The plaintiffs bring state law claims alleging invasion of privacy, assault and battery, and negligence based on standards established by RSA § 594:2 and 4.  The defendants address only the negligence claim on the merits, contending that the New Hampshire statutes were inapplicable to the defendants who are Maine police officers.  The defendants also state generally that the state law claims should be dismissed for lack of jurisdiction following summary judgment on the civil rights claims.  Since some of the civil rights claims survive summary judgment, supplemental jurisdiction exists as to the state law claims.

With respect to the negligence claims under RSA § 594:2 and 4, the plaintiffs argue that the mutual aid agreement, attached to Chief Strong's affidavit, between Portsmouth and Kittery makes the New Hampshire statutes applicable to the Maine police officers when they operate in New Hampshire.  Resolving inferences in the plaintiffs' favor, the existence of the agreement and Chief Strong's reliance on the agreement for the officers' authority in New Hampshire raise unresolved issues about the application of the statutes in this case.  Therefore, the effect of the mutual aid agreement in the circumstances of this case cannot be determined based on the record presented for summary judgment.  The plaintiffs also argue that their claim is

20

based on negligence theories other than the statutory standard.

The defendants have failed to demonstrate that they are entitled to summary judgment on the plaintiffs' state law claims.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (document no. 11) is granted in part and denied in part.  Summary judgment is granted in the defendants' favor as to counts three and four, and is granted as to their claims based on substantive due process in count one.  The motion is otherwise denied.

SO ORDERED.

                          _____
                          Joseph A. DiClerico, Jr.
                          District Judge

May 26, 1999

cc:  Brian T. Stern, Esquire
     Peter A. Meyer, Esquire
     Edward R. Benjamin Jr., Esquire