# United States Court of Appeals
## For the First Circuit

No. 99-2150

ANGELA FIGUEROA-TORRES, ET AL.,

Plaintiffs, Appellees,

v.

PEDRO TOLEDO-DÁVILA, ET AL.,

Defendants.

JULIO PERÉZ-TIRADO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jose Antonio Fuste, U.S. District Judge]

Before

Selya, Circuit Judge,
Bownes, Senior Circuit Judge,
and Stahl, Circuit Judge.

Ricardo L. Rodríguez-Padilla, with whom Ricardo Rodríguez-Padilla Law Offices, and Orlando Duran-Medero were on brief for appellant Julio Perez-Tirado.

Mauricio Hernández-Arroyo, with whom Law Offices of Mauricio Hernández-Arroyo, Geraldo Rivera-Figueroa, in representation of Linoska Rivera-Nieves, and Maria E. Irizarry, in representation of Nestor Rivera Irizarry, were on brief for appellees.

November 21, 2000

**BOWNES,** <u>Senior Circuit Judge</u>.  This is an appeal from a jury verdict in a civil rights action brought under 42 U.S.C. §§ 1983, 1986, and 1988, against six police officers of the Puerto Rico Police Department for the death of Néstor Rivera-Figueroa.  The appeal is brought by the only police officer found liable, Sergeant Julio Pérez-Tirado (hereinafter sometimes "defendant").  Suit was brought by the mother, and siblings of Néstor Rivera- Figueroa on their own behalf and on behalf of the son and daughters of the decedent.  The jury awarded the son $15,000, and the youngest of three daughters (two years old) $20,000.  The son, although twenty-one at the time of the suit, was mentally retarded.  The other daughters of the decedent were nineteen and twenty-one years old at the time of suit and were not awarded any damages.  The court granted plaintiffs' request for attorney's fees in the amount of $96,852.

Four of the police officers named in the complaint were directly involved in the arrest of decedent:  Héctor Rivera-Torres; Elvin Fernández; Leslie Germain-Rodríguez; and the officer found liable, Julio Pérez-Tirado.  The complaint alleged that those four officers treated the decedent in such a way during his arrest as to cause his death.

-2-

The complaint alleged that the remaining two defendants, Octavio Cruz-Candelario and Pedro Toledo-Dávila, supervisory officers who were not present at the actual arrest, were liable for the death of Néstor Rivera because of "the inappropriate selection and/or inadequate training and supervision and discipline" of the four officers directly involved in the arrest of the decedent. At the close of the evidence, the complaint was dismissed by the district court as to defendants Leslie Germain-Rodríguez, Octavio Cruz-Candelario and Pedro Toledo-Dávila. No appeals have been taken from these rulings.

Defendant's motions for judgment as a matter of law were denied. The district court denied defendant's motion for a new trial.

Defendant makes the following contentions on appeal: (1) the evidence was insufficient because it did not prove that defendant caused or contributed to cause the death of the decedent; (2) the district court erred by misapplying the "eggshell skull" rule in determining liability for the death of the decedent; (3) the verdict was the result of passion and prejudice; and (4) the district court erred in the award of attorney's fees and costs.

We affirm the verdict in all respects but remand for a new determination of attorney's fees.

Before discussing the defendant's assignments of error we deem it useful to discuss the peculiar posture in which this appeal arises. In this case, the plaintiffs alleged five causes of action in their complaint. These boiled down to three sets of claims. First, they asserted that the defendants violated the decedent's rights under the Fourth and Fourteenth Amendments and sought to recover damages under 42 U.S.C. § 1983. Second, they asserted pendent claims arising under Puerto Rico law, charging wrongful death and loss to the decedent's estate. Third, they asserted survivors' claims, also arising under local law, for their own emotional distress, loss of society, and the like.

In preparing the verdict form, the district court did not differentiate among these claims. Instead, the verdict form simply asked the jurors to report whether they found any defendant liable (presumably on any theory), and if so, to indicate which defendant(s) were liable to which plaintiff(s). The verdict form then provided a space for the jury to insert the amount of damages awarded to each prevailing plaintiff. The district court's jury instructions were in the same vein.

Ultimately, as we have said, the jury found Pérez-Tirado liable to two of the plaintiffs. The verdict form did not require the jurors to state the theory under which liability was found and damages awarded, and they did not do so. Pérez-Tirado did not object to the judge's charge, the verdict form, or the returned verdict for lack of particularization.[1] This constituted a waiver as to these items. We have held that a failure to object "forfeit[s] any right to gripe about a lack of procedural orthodoxy" in such respects. Putnam Resources v. Pateman, 958 F.2d 448, 457 (1st Cir. 1992). After all, a party "may not sit by without objection to rulings or instructions, and then after verdict and judgment, and when it is too late for the court to change its rulings or charge, come forward with objections on appeal and seek to put the court in error." Id. at 457 n.6 (citation omitted). This principle controls here. Thus, notwithstanding our serious doubts about the way in which the district court apparently merged different causes of action and theories of recovery, we proceed to analyze the case as the parties have briefed and argued it.

---

[1]Perez-Tirado not only acquiesced to these proceedings below, but also has not made any coherent argument on appeal addressing these points. For that reason, too, waiver exists. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that arguments that are undeveloped on appeal are deemed waived).

# I.

## Sufficiency of the Evidence

Our standard of review is clear.

> Petitions for judgments as a matter of law under Rule 50(a)(1) Fed. R. Civ. P. will be granted only in those instances where, after having examined the evidence as well as all permissible inferences drawn therefrom in the light most favorable to non-movant, the court finds that a reasonable jury could not render a verdict to the party's favor. In carrying out this analysis the court may not take into account the credibility of witnesses, resolve evidentiary conflicts, nor ponder the weight of the evidence introduced at trial. . . .
>
> . . . .
>
> The nisi prius court's denial of a petition for new trial will be overturned only for abuse of discretion. A new trial is warranted only in those situations where the verdict is contrary to the clear weight of the evidence introduced at trial and its ratification would result in a miscarriage of justice. . . .

Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 316-17 (1st Cir. 1999) (internal citations omitted).

Our determination of the sufficiency of the evidence requires that we present the facts as a jury might have found them, consistent with the record but in the light most favorable to the verdict. See Grajales-Romero v. American Airlines, Inc., 194 F.3d 288 (1st Cir. 1999).

## The Evidence as Viewed Favorable to the Verdict

On the day of decedent's arrest and death, the defendant and three other police officers had been assigned to a special drug unit. Their mission was to cruise the streets of San Juan in search of drug transactions and arrest the participants. Defendant was in charge of the unit.

As the police cruiser drove through a government-subsidized housing development, defendant saw a drug transaction in progress. The police got out of the cruiser and attempted to arrest three drug buyers. Defendant testified that he went after one buyer who was attempting to swallow small plastic envelopes (about one to one and one half inches long) presumably containing heroin. He was unsuccessful and as he held the suspect, he noticed that one of the other officers was having difficulty subduing the decedent, who was vigorously resisting arrest. Defendant left the person he had restrained and went to help in the arrest of decedent. Once the suspect was freed from restraint by defendant he fled the scene. The other drug buyer was arrested without incident.

Defendant and two of the other officers continued to struggle with the decedent. There was eye-witness testimony about what happened during the struggle between the police officers and decedent.

Efrain Barbosa, who was the drug seller, testified by deposition to the following effect. The police jumped on the decedent when he tried to swallow the drugs he had bought; the police officers hit and kicked decedent everywhere on his body. Defendant was identified as one of the officers who hit and kicked decedent.

Rosa Maria Gonzalez was walking by the scene on her way to the store. She testified that she saw police officers leaning over the decedent who was lying on the sidewalk. The police "were hitting him on the back and they were telling him to throw out the drugs he had swallowed . . . ." The witness identified defendant as one of the police officers who was hitting the decedent. The witness also testified that the police kicked the decedent in the side and hit him on the face with their fists.

Marisela Cotero, a tenant in the housing development, testified that she saw two police officers punch the decedent in the stomach, kick him, put their hands in his mouth, slap his face, and throw him on the ground. The witness identified defendant as one of the participating officers.

Police officer José Miguel Requena Mercado, one of the defendants, testified as follows: He and another officer, Elvin Fernandez, fell to the ground struggling to arrest the decedent.

-8-

After the decedent was subdued he walked to the police vehicle. When they got to the prison, the decedent started feeling ill and Officer Requena took him to the hospital. When they arrived at the hospital, decedent told Requena he wanted to defecate and throw up, which he did in the toilet facilities. Neither the feces nor the vomit was examined for drugs. As he and decedent and the other officers came out of the bathroom, the decedent collapsed. A doctor arrived and the decedent was taken to the intensive care unit, where he subsequently died.

Dr. María Conde, who did the autopsy on decedent, testified, in effect, as follows: "The deceased died of a laceration of the spleen and a coagulation in the abdominal cavity of approximately 20,000 cc's [of blood]." The laceration of the spleen was the result of a trauma, which "could be because someone hit him or because he fell and hit that area." The presence of opiates in the blood was a contributing factor in his death because the opiates interfere with the respiratory function. Independently of any contributing factor a ruptured spleen would have caused the death. The cause of death "was corporal trauma, not a drug overdose." On cross-examination, Dr. Conde testified that the spleen probably had some kind of disease and that "it's easier to lacerate an enlarged spleen than a normal one."

Defendant argues strenuously that the "<u>undisputed</u> medical evidence . . . negated the possibility of the violation of any constitutional rights . . . ." Def's Br. at 16 (emphasis added). Presumably this statement is made on the basis of the testimony of Dr. David Questell Alvarado who treated decedent before the decedent was sent to the intensive care unit where he died. Dr. Questell testified that the decedent died of "narcotic intoxication." As the district court properly pointed out in rejecting the motion for a new trial, it was up to the jury to choose which of the two doctors' testimony should be accepted.

Defendant makes other assertions in his brief that are directly controverted by the record evidence. Experienced counsel should recognize that the jury decides disputed questions of fact and that statements in the brief and at oral argument cannot erase record evidence that counsel does not like.

## II.

### Liability

We next discuss defendant's claim that he was not responsible for the decedent's death because his spleen was diseased and enlarged. We are not sure just what defendant's precise claim of error is as to the court's application of the

"eggshell skull" doctrine. He argues in his brief at page 32: "In applying this doctrine to this particular case, the district court erred in the law. It assumed that liability existed, when the evidence established the contrary, to find that Pérez-Tirado was liable for the pre-existing damages under the 'egg-shell rule.'" This appears to be an argument that the district court substituted the "eggshell skull" doctrine for a finding of causation. The court's charge to the jury negates that contention.

> In order to find in favor of the plaintiffs under principles of negligence, you must find that there was an act or omission by fault, negligence, or intention that was proximate — that proximately caused plaintiffs' injuries.
>
>   . . . .
>
> An injury or damage is proximately caused by an act or by a failure to act whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonable probable consequence of the act or of the omission.

(Emphasis added.)

There was a plethora of evidence in the record from which the jury could have found that defendant kicked and punched the decedent in the body and helped push him to the

-11-

ground.  Any or a combination of these acts could have caused the decedent's spleen to rupture, as Dr. Conde testified.

In its written opinion denying the motion for a new trial the district court held that:

> [W]e found that Decedent's cause of death was corporal trauma . . . .  It is the source of the corporal trauma that was an issue of fact left for the jury to determine. . . .
>
> Defendant argues that, if rupture of the spleen did cause Decedent's death, he was not responsible because Decedent's preexisting sickness made him prone to that injury.  However, we find that Decedent's preexisting injury or weakness in the spleen, does not absolve Defendant of his liability.  It is well settled that in action for damages, the tortfeasor "takes his victim as he finds him."

If, rather than questioning the district court's finding of causation, defendant's contention is meant to imply that the "eggshell skull" doctrine should have been excluded as a matter of law, we must determine whether the doctrine was correctly applied to the facts of this case.  We agree with the district court that it was.  An illuminating explication of the "eggshell skull" doctrine is set forth in W. Page Keeton et al., Prosser and Keeton on The Law of Torts § 43 at 291 (5th ed. 1984).

> There are some areas in which even the courts which have been most vocal in favor of the "foreseeable risk" limitation upon

-12-

> liability have been forced to discard it.
> <u>There is almost universal agreement upon
> liability beyond the risk, for quite
> unforeseeable consequences, when they follow
> an impact upon the person of the plaintiff</u>.
>
> It is as if a magic circle were drawn about
> the person, and one who breaks it, even by
> so much as a cut on the finger, becomes
> liable for all resulting harm to the person,
> although it may be death. . . . The
> defendant of course is liable only for the
> extent to which the defendant's conduct has
> resulted in an aggravation of the pre-
> existing condition, and not for the
> condition as it was; but as to the
> aggravation, foreseeability is not a factor.
> One of the illustrations which runs through
> the English cases is that of the plaintiff
> with the "eggshell skull," who suffers death
> where a normal person would have had only a
> bump on the head; . . . .

<u>Id.</u> (emphasis added).

Neither the Supreme Court nor the First Circuit has spoken at length as to the validity of the "eggshell skull" doctrine. The Supreme Court held in <u>United States</u> v. <u>Feola</u> that an offender "takes his victim as he finds him." 420 U.S. 671, 685 (1975). In that case, the Court held that in determining the defendant's liability for an assault of a federal officer, it was irrelevant that the assailant did not know that the victim was an officer. The First Circuit, in <u>Doty</u> v. <u>Sewall</u>, cited <u>Feola</u> as support for the proposition that "[i]n personal injury law, it is well settled that in an action for damages,

the tortfeasor 'takes his victim as he finds him.'"  908 F.2d 1053, 1059 (1st Cir. 1990).

Other circuits have spoken more definitively as to the validity of the "eggshell skull" doctrine.  The Second Circuit, in <u>Maurer</u> v. <u>United States</u>, held that "[i]t is a settled principle of tort law that when a defendant's wrongful act causes injury, he is fully liable for the resulting damage even though the injured plaintiff had a preexisting condition that made the consequences of the wrongful act more severe than they would have been for a normal victim."  668 F.2d 98, 99 (2d Cir. 1981).

The Fifth Circuit, in <u>Dunn</u> v. <u>Denk</u>, held that:

> the "directly and only" language [taken from applicable case law] was intended to distinguish between injuries resulting from excessive force and those resulting from the justified use of force.  It was not intended to displace the venerable rule that a tortfeasor takes his victim as he finds him or to immunize the exacerbation of a pre-existing condition, leaving the weakest and most vulnerable members of society with the least protection from police misconduct.

54 F.3d 248, 250-51 (5th Cir. 1995) (internal citations, emphasis and footnotes omitted).

The Sixth Circuit, in <u>Shannon</u> v. <u>Lester</u>, held that a plaintiff could recover damages under § 1983 for any aggravation of his pre-existing injuries caused by the police's unreasonable

-14-

delay in taking him to the hospital.  519 F.2d 76, 79 (6th Cir. 1975).

The Seventh Circuit, in <u>Rardin</u> v. <u>T & D Mach. Handling, Inc.</u>, held that "the injurer takes his victim as he finds him and is therefore liable for the full extent of the injury even if unforeseeable . . . even if . . . [the victim], because of a preexisting injury sustains a much greater loss than the average victim would have . . . ."  890 F.2d 24, 28 (7th Cir. 1989) (citations omitted).

The Ninth Circuit, in <u>Lutz</u> v. <u>United States</u>, held that defendant was liable for psychological damage inflicted on a victim who had been attacked by defendant's dog, even though that damage was caused in part by a pre-existing condition.  The court held that the situation was "an example of the general rule that the defendant must take the plaintiff as he finds her and accept liability for all consequences flowing from the injury."  685 F.2d 1178, 1186 (9th Cir. 1982) (citation omitted).

We hold that the district court did not substitute the "eggshell skull" doctrine for a finding of cause or liability, and that the court was correct in its application of the doctrine.

**III.**

## Prejudice or Passion

We have read the record carefully and do not find sufficient evidence suggesting that prejudice or passion played a part in the jury's verdict to warrant a reversal on that ground. Defendant advances two bases for his prejudice and passion argument. The first is a question asked by the jury during deliberations as to the consequences of an adverse verdict on the other defendant police officers. After consulting with counsel, the district court properly instructed the jury that the consequences of the verdict were not the jury's concern because its duty was to decide the case on the basis of the facts and regardless of the verdict's repercussions. Neither the jury's question nor the court's response established prejudice or passion.

The second basis for asserting the prejudice or passion claim is that the verdicts were for decedent's mentally retarded son and decedent's two-year-old daughter. If either or both of the verdicts were inordinately excessive, defendant might have a stronger argument. But in a wrongful death case, verdicts of $15,000 and $20,000 do not connote much passion or any prejudice. This is especially so in light of testimony by an economist that the present value of the decedent's future loss of earnings was $89,000. We think the jury's verdict was

-16-

realistic. The evidence showed that decedent did not have much of a future ahead. He was addicted to drugs and resisted arrest because he was on probation for the murder of his brother and was afraid he would go to jail. The verdict comports with a realistic (if not inevitable) appraisal of the facts.

We have read the record carefully and have no difficulty affirming the verdicts. We also affirm the district court's denial of the Rule 50 motion and the motion for a new trial.

## IV.

### Attorney's Fees

We preface our discussion of attorney's fees with a reminder that Pérez-Tirado has waived the district court's agglomeration of different causes of action. See supra at 3-4. Because the damages awarded were payable to individual survivors, not to the decedent's estate, it appears quite probable that the jury found no liability on the § 1983 claim simpliciter. The defendant, however, did not object to the award of fees on this ground, nor does he assign error in this respect on appeal. He has, therefore, forfeited the point. See Zannino, 895 F.2d at 17. In all events, this court has held that when state-law and § 1983 claims are inextricably intertwined, a plaintiff who prevails only on the state-law

claim nonetheless may receive a fee award under 42 U.S.C. § 1983. See Williams v. Hanover Housing Auth., 113 F.3d 1294, 1298-99 (1st Cir. 1997) (holding that if a plaintiff in such circumstances succeeds in the primary objective of his law suit, he may receive attorney's fees even if he prevails only on a state-law claim). It is against this backdrop that we turn to the complaint made by the defendant vis-à-vis the fee award.

The attorney for the plaintiffs submitted a sworn statement to the district court showing that he spent 441.8 hours out of court preparing the case and 58.5 hours in court. He requested $225 per hour for his in-court time and $175 for his out-of-court work. This amounted to a total of $90,477.50. The plaintiffs' attorney also asked for $13,162.50 for the services of his paralegal, billed at the rate of $75 per hour for 85 hours.

The district court reduced the rate for the in-court time to $150 per hour and $130 per hour for the out-of-court time. The court also reduced the rate of the paralegal to $40 per hour. The court explicitly stated:

> In making this determination, we were mindful of the constellation of factors of which the First Circuit cautions courts to be aware. However, the sole basis on which we reduce the rates is to reflect the prevailing market rate of lawyers and paralegals of comparable skill, experience, and reputation in this jurisdiction.

> Therefore, we note that we do not reduce the rate because Plaintiffs only prevailed against one of the Defendants, . . . because Plaintiffs received a significantly lower amount of damages and attorney's fees than they requested.

The district court denied the motion of the defendants sued in their supervisory capacity - Toledo-Dávila and Cruz Calendario - for attorney's fees and costs. That ruling has not been appealed.

We discussed the standard of review applied to district court decisions concerning awards of attorney's fees in Coutin v. Young & Rubicam Puerto Rico, Inc., 124 F.3d 331, 336 (1st Cir. 1997):

> We will disturb such an award only for mistake of law or abuse of discretion. . . . In this regard, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.

(Internal citation and quotation marks omitted.) When a court has relied on impermissible criteria in determining the appropriate amount of fees awarded, the case can be remanded for a clearer statement of the rationale upon which the award was based. See, e.g., id. at 342 (holding that the district court had offered no plausible reason for neglecting to apply the

-19-

lodestar method of calculating fees, and requiring that the fees awarded be adjusted to reflect its proper application).

The district court was succinct in its treatment of the severability issue, simply citing Hensley v. Eckerhart, 461 U.S. 424, 435 (1983), and Coutin, 124 F.3d at 338-39, and asserting that "often claims are related factually and legally; thus a fee award should not necessarily be reduced simply because the plaintiff failed to prevail on every contention in the lawsuit." The court then stated that "we note that we do not reduce the rate because Plaintiffs only prevailed against one of the Defendants, . . ." and cited Cobb v. Miller, 818 F.2d 1227, 1233 (5th Cir. 1987), a Fifth Circuit decision allowing for attorney's fees to be based on an aggregation of claims where the claims cannot easily be separated. But while the juxtaposition of these brief statements with the cases cited is apparently meant to imply that the claims in the present case are similarly inseparable, the court fails to make any findings or to point to any facts justifying such an analogy.

Both the Supreme Court and this circuit have spoken as to when claims can appropriately be fused for the purpose of determining attorney's fees. The Supreme Court held in Hensley:

> Many civil rights cases will present only a single claim. In other cases the plaintiff's claim for relief will involve a common core of facts or will be based on

-20-

> related legal theories. Much of counsel's
> time will be devoted generally to the
> litigation as a whole, making it difficult
> to divide the hours expended on a claim-by-
> claim basis. Such a lawsuit cannot be
> viewed as a series of discrete claims.
> Instead the district court should focus on
> the significance of the overall relief
> obtained by the plaintiff in relation to the
> hours reasonably expended on the litigation.
>
> * * * *
>
> Where the plaintiff has failed to prevail on
> a claim that is distinct in all respects
> from his successful claims, the hours spent
> on the unsuccessful claim should be excluded
> in considering the amount of a reasonable
> fee.

Hensley, 461 U.S. at 435, 440 (emphasis added).

We recently held that "[w]hen different claims for relief are not interconnected – that is, when the claims rest on different facts and legal theories – they are by definition severable and unrelated. Attorneys' fees normally should not be awarded for time spent litigating (or preparing to litigate) unsuccessful, severable claims." Coutin, 124 F.3d at 339. The Coutin opinion follows a long line of our cases reaffirming the doctrine of interrelatedness. See, e.g., Nydam v. Lennerton, 948 F.2d 808, 812 (1st Cir. 1991); Culebras Enters. Corp. v. Rivera-Rios, 846 F.2d 94, 102 (1st Cir. 1988); Wagenmann v. Adams, 829 F.2d 196, 225 (1st Cir. 1987); Aubin v. Fudala, 782 F.2d 287, 291 (1st Cir. 1986).

-21-

The district court was justified in refusing to differentiate between the claims brought against each of the four officers alleged to have been involved in the beating of the decedent, especially in light of City of Riverside v. Rivera, 477 U.S. 561 (1986). In Rivera, the Court allowed for high attorney's fees despite the acquittal of numerous defendants, agreeing with the lower courts that "it was never actually clear what officer did what until we had gotten through with the whole trial." Id. at 570 (internal quotation marks omitted).

But while the claims against the officers can clearly be said to have arisen out of a "common core of facts" or to have been "based on related legal theories," thus justifying their aggregation in determining the appropriate amount of attorney's fees awarded, the same is not so for those claims alleging supervisory liability. While it is true that the claims all stemmed from a common incident - the alleged mistreatment of the deceased - it does not follow that the claims cannot be severed. Whatever common elements there may be between the claims, it is indisputable that the facts that would have to be proved to prevail against the arresting officers, as well as the legal theories that would serve as a foundation for the claims alleging direct participation in the arrest and

-22-

mistreatment, are wholly different than those relating to supervisory liability.

In order to establish supervisory liability under § 1983, a plaintiff must show an "affirmative link" between the subordinate officer and the supervisor. See Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000). A supervisor "may be liable for the foreseeable consequences of [offending conduct by subordinates] if he would have known of it but for his deliberate indifference or willful blindness. . . ." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994). "To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk. . . . [D]eliberate indifference alone does not equate with supervisory liability; a suitor also must show causation." Camilo-Robles v. Hoyos, 151 F.3d 1,7 (1st Cir. 1998), cert. denied, 525 U.S. 1105 (1999) (citations omitted). Discovery relating to supervisory liability would almost certainly entail a much wider and more diverse set of facts than discovery relating to the officers' individual liability. That success on the former claims is contingent upon success on the latter does not mean that the two are based on common facts or legal theories.

-23-

The unsuccessful supervisory liability claims were based on different facts and legal theories than the successful excessive force claims, and were thus severable. Because such unsuccessful claims do not fall within the ambit of § 1988(b), the district court acted beyond the bounds of its discretion in awarding attorney's fees stemming from them. The time sheets submitted by plaintiffs' lawyer, upon which the district court's calculation of attorney's fees was based, do not differentiate between time spent on the different claims. The case must be remanded for determination of what portion of plaintiffs' lawyer's time was spent in furtherance of the unsuccessful supervisory liability claims. Such time must be deducted from the amount of the fee award at the applicable rates approved by the district court.

**Affirmed in part; reversed in part**. **Remanded for further proceedings in accord with this opinion. Costs shall be taxed against the defendant**.