**Grancid CAMILO–ROBLES,**
**Plaintiff, Appellee,**

v.

**Jose R. ZAPATA, a/k/a Jose R. Zapata–**
**Rivera, Defendant, Appellant.**

No. 98–1590.

United States Court of Appeals,
First Circuit.

Heard March 1, 1999.

Decided April 20, 1999.

John M. García with whom Orlando Fernández and García & Fernández were on brief, for appellant.

Judith Berkan, with whom Peter Berkowitz was on brief, for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

Plaintiff-appellee Grancid Camilo–Robles seeks damages under 42 U.S.C. § 1983 for indignities that he suffered at the hands of a rogue officer of the Puerto Rico Police Department, Miguel Díaz–Martínez. *See Camilo–Robles v. Hoyos*, 151 F.3d 1, 4 (1st Cir.1998) (*Camilo–Robles I*) (describing incident), *cert. denied*, —— U.S. ——, 119 S.Ct. 872, 142 L.Ed.2d 773 (1999). He contends, among other things, that various officials in the police hierarchy were deliberately indifferent to, and failed properly to supervise, their notorious subordinate. In an earlier opinion, we upheld the district court's pretrial order denying qualified immunity to a number of defendants in this action, including three high-ranking police officials. *See id.* at 9–15.

The case returns today for the same purpose, but at the behest of a different defendant: José R. Zapata–Rivera (Zapata), who served as the police department's Assistant Superintendent for Administrative Investigations for roughly five months immediately preceding Díaz–Martínez's assault on Camilo–Robles. The duties of that post include the investigation of complaints about the conduct of police officers and, when appropriate, the taking of corrective action (which might include anything from a simple reprimand to requiring retraining to recommending suspension or expulsion, depending on the circumstances). Camilo–Robles claims that, given Díaz–Martínez's widespread reputation as a bashi-bazouk, Zapata manifested deliberate indifference to citizens' rights in leaving him, armed and unregenerate, in a position in which he could perpetrate further acts of brutality.

Zapata denies any responsibility for the May 1994 encounter of which Camilo–Robles complains. He maintains that he per-

formed his official duties in a proper and lawful manner; that none of his acts or omissions violated Camilo–Robles's federally protected rights; that the record evidence does not bespeak deliberate indifference; and that, in all events, no causal connection exists between his conduct and the incident in question. Zapata incorporated these arguments in a motion for summary judgment asking, *inter alia,* that the district court declare him qualifiedly immune from suit. The court denied the motion in a decurtate order, writing only "that there are issues of material fact which preclude summary judgment." This interlocutory appeal ensued.

■ Our analysis begins with bedrock. Section 1983 provides a private right of action against state actors—that is, public officials acting under color of state law—who deprive individuals of rights confirmed by federal constitutional or statutory law. Liability under that rubric is not strict or absolute. The qualified immunity doctrine constitutes one escape hatch. In practice, it holds harmless state actors whose behavior has violated plaintiffs' rights as long as those rights were not at the time clearly established under the Constitution or laws of the United States. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Díaz v. Díaz Martínez,* 112 F.3d 1, 3 (1st Cir.1997).

■ The classic question that a qualified immunity defense poses is whether the allegedly violated federal right was established with sufficient clarity that a reasonable government functionary should have conformed his conduct accordingly. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (reiterating that qualified immunity is meant to shield public officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"). In answering this question, a court must undertake an objective inquiry into the totality of the circumstances, with a view toward ascertaining whether the right allegedly infringed, articulated at an appropriate level of generality, was settled at the time of the public official's actions, and if so, whether the official's conduct was obviously inconsistent with that right. *See id.* at 638–40, 107 S.Ct. 3034. In the last analysis, then, qualified immunity purposes to protect government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct. *See id.* at 639–41, 107 S.Ct. 3034; *see also Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (explaining that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

In the supervisory liability context, the qualified immunity inquiry at times presents peculiar problems. Under prevailing jurisprudence, neither a finding of "no liability" nor a finding of qualified immunity follows invariably upon a showing that the defendant-supervisor's conduct, in and of itself, failed directly to violate federally protected rights. Thus, in a subset of supervisory liability cases, courts facing the need to conduct a qualified immunity analysis have been compelled to go beyond the paradigmatic *Harlow* inquiry. This, in turn, has given rise to vexing questions of appellate jurisdiction. We explain briefly.

Although the Supreme Court has yet to speak explicitly on the matter, it is common ground among the lower federal courts that, for purposes of section 1983, supervisors sometimes may be held accountable for their subordinates' misdeeds. *See Camilo–Robles I,* 151 F.3d at 6–7. Since respondeat superior cannot serve as a basis for such liability, *see Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (collecting cases), courts traditionally have required a showing that the superior either was a primary actor involved in, or a prime mover behind,

the underlying violation. The case law speaks of the necessity of showing an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization. *See Aponte Matos v. Toledo Davila,* 135 F.3d 182, 192 (1st Cir.1998); *Braddy v. Florida Dep't of Labor & Emp. Sec.,* 133 F.3d 797, 802 (11th Cir.1998); *Otey v. Marshall,* 121 F.3d 1150, 1155 (8th Cir.1997); *Southard v. Texas Bd. of Crim. Justice,* 114 F.3d 539, 550–51 (5th Cir.1997).

When a plaintiff premises his section 1983 claim on allegations that the defendant-supervisor was a primary violator or direct participant in the rights-violating incident, the qualified immunity framework envisioned by *Harlow* and its progeny works quite well. In contrast, the framework engenders some confusion when applied to cases in which the defendant-supervisor is sued as a secondary or indirect violator.

█ In such cases, liability attaches if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation. *See, e.g., Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 453 (5th Cir.1994); *Greason v. Kemp,* 891 F.2d 829, 836–37 (11th Cir.1990); *Sample v. Diecks,* 885 F.2d 1099, 1116–17 (3d Cir.1989); *cf. City of Canton v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (explicating deliberate indifference standard in a municipal liability setting). Under such a theory, a supervisor may be brought to book even though his actions have not directly abridged someone's rights; it is enough that he has created or overlooked a clear risk of future unlawful action by a lower-echelon actor over whom he had some degree of control.

█ In these "neglect-of-risk" cases, confusion arises when qualified immunity is factored into the mix because we accept by hypothesis that the supervisor's actions have not, in themselves, infringed on any federally protected right. This means that, unlike the typical section 1983 case, we cannot concentrate the *Harlow* inquiry on the underlying right; if we did, the supervisor's qualified immunity would depend entirely on the reasonableness of the subordinate's actions, and such an approach would contravene the axiom that the actions of persons sued in their individual capacities under section 1983 must be assessed on their own terms. *See Malley,* 475 U.S. at 341, 106 S.Ct. 1092; *Harlow,* 457 U.S. at 818–19, 102 S.Ct. 2727. Such an approach also would frame the relevant inquiry in terms disquietingly close to those involved in the forbidden doctrine of respondeat superior.

To resolve this enigma, courts consigned to struggle with neglect-of-risk cases generally have incorporated a review of the merits of derivative tort liability into the qualified immunity calculus. The ensuing analysis customarily centers around whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort. *See, e.g., Camilo–Robles I,* 151 F.3d at 7–8; *Braddy,* 133 F.3d at 802; *Otey,* 121 F.3d at 1155; *Southard,* 114 F.3d at 554. To the extent that this methodology heightens the imbrication between merits and immunity inquiries, it is imperfect. *See Mitchell v. Forsyth,* 472 U.S. 511, 527–29, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (discussing the separateness of the two inquiries); *Camilo–Robles I,* 151 F.3d at 7 (stating that "courts are well-advised to separate 'qualified immunity' analysis from 'merits' analysis whenever practicable"). Nonetheless, we use the methodology because it is what our precedent (and that of almost every other circuit) requires for the performance of this type of supervisory liability/qualified immunity analysis.

This methodological imperfection tends to exacerbate a familiar jurisdictional quandary. Interlocutory orders (such as orders denying pretrial motions to dismiss

or for summary judgment) normally are not appealable as of right when entered. *See* 28 U.S.C. § 1291 (1994). A different result sometimes obtains, however, when a state actor unsuccessfully presses a pretrial motion seeking the shelter of qualified immunity. We say "sometimes" because the jurisdictional waters are murky. *See Camilo–Robles I,* 151 F.3d at 8 ("In the qualified immunity realm, the dividing line between appealable and non-appealable denials of summary judgment is blurred."). Moreover, because the standard qualified immunity framework fits neglect-of-risk cases awkwardly, *see id.* at 7–9, efforts to distinguish appealable pretrial denials of qualified immunity from non-appealable ones—always a Byzantine endeavor—become even more difficult.

■ Not every case is problematic. The ground rules are reasonably clear at either end of the jurisdictional continuum. The Supreme Court has held that the denial of a dispositive motion bottomed on qualified immunity cannot support an interlocutory appeal if the controlling question is "whether or not the pretrial record sets forth a genuine issue of fact for trial." *Johnson v. Jones,* 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). If, however, the "operative question is purely legal in nature," an interlocutory appeal of such an order is available. *Camilo–Robles I,* 151 F.3d at 8 (citing *Johnson,* 515 U.S. at 319, 115 S.Ct. 2151). In *Stella v. Kelley,* 63 F.3d 71 (1st Cir.1995), we described this dichotomy in the following way: "a summary judgment order which determines that the pretrial record sets forth a genuine issue of fact, as distinguished from an order that determines whether certain given facts demonstrate, under clearly established law, a violation of some federally protected right, is not reviewable on demand." *Id.* at 74; *accord Behrens v. Pelletier,* 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

Because of its focus on tort causation and culpability, the qualified immunity analysis in neglect-of-risk cases seldom, if ever, raises abstract questions of law about whether a right was clearly established. Moreover, the law is well-settled anent a supervisor's liability for the conduct of his subordinates. Thus, in interlocutory appeals from the denial of qualified immunity in this subset of cases, the jurisdictional question frequently falls into the gray area, compelling the appellate tribunal to decide whether the assertion of qualified immunity turns on the existence of genuine issues of material fact (which is how the plaintiff invariably will characterize the situation) or on a purely legal entitlement to surcease under the relevant causation and culpability standards, regardless of factual disputes (which is how the defendant invariably will characterize the situation).

This is the crux of the jurisdictional quandary that confronts us today—and such quandaries become more intractable where, as here, the lower court has done very little to clarify the basis for its ruling. Fortunately, this case comes equipped with an unaccustomed luxury: a prototype. Between August 1990 and December 1993 (when Zapata succeeded him), Tomás Vazquez Rivera (Vazquez) held the Assistant Superintendency. On September 8, 1993, Díaz–Martínez shot two persons (killing one and wounding the other) while on active duty at the Barbosa Housing Project. The surviving victim and the decedent's family sued Díaz–Martínez and several police hierarchs, including Vazquez. *See Diaz,* 112 F.3d at 2–3. Vazquez sought unsuccessfully to be relieved of the burdens of suit on qualified immunity grounds. *See id.* He then essayed an interlocutory appeal. In rejecting that initiative, we made two pronouncements that are significant here.

First, we accepted jurisdiction over Vazquez's purely legal argument (which questioned the state of the law at and before the time of the Barbosa Housing Project incident). We concluded that the applicable law, and, hence, the plaintiffs' asserted right, was clearly established by

1993. *See id.* at 4 (holding that "it is beyond serious question that, at the times relevant hereto, a reasonable police supervisor, charged with the duties that Vazquez bore, would have understood that he could be held constitutionally liable for failing to identify and take remedial action concerning an officer with demonstrably dangerous predilections and a checkered history of grave disciplinary problems"). This conclusion applies full-bore in the case at hand—and Zapata, to his credit, does not seriously argue to the contrary.

We then addressed Vazquez's fact-based assertion that the trial court erred in refusing to grant his summary judgment motion because the evidence did not show deliberate indifference on his part. *See id.* at 4–5. We noted that the trial court had "rejected this argument on the basis that the record contained controverted facts," and held, therefore, that the determination was "not reviewable on an interlocutory appeal." *Id.*

At first blush, it is difficult to remove the instant case from *Díaz*'s precedential orbit. Zapata tries; in an effort to distinguish his situation, he bears down heavily on the fact that, unlike Vazquez, he was in office only a short time when Díaz–Martínez accosted Camilo–Robles. In this regard, he points out that he assumed the Assistant Superintendent position in late 1993; that, between then and May of 1994, he had only one concrete opportunity to act with respect to Díaz–Martínez;[1] that his conduct at that time, in and of itself, furnishes an insufficient foundation for a claim of deliberate indifference; and that, because of the brevity of his service, he,

unlike his predecessor, was not on notice of the incriminating details regarding Díaz–Martínez that subsequently came to light. *See Camilo–Robles I,* 151 F.3d at 4–5 (chronicling Díaz–Martínez's record); *Diaz,* 112 F.3d at 2–3 (same). This lack of knowledge, he says, compels a conclusion that he acted reasonably in not initiating corrective action vis-à-vis Díaz–Martínez prior to May of 1994.

■ We agree with Zapata's main premise: the extent of a superior's knowledge of his subordinate's proclivities is a central datum in determining whether the former ought to be liable (or immune from suit) for the latter's unconstitutional acts. *See Camilo–Robles I,* 151 F.3d at 7. Here, however, the question of notice is hopelessly factbound. On one hand, Zapata argues, with some evidentiary support, that he appropriately handled the sole complaint that came to his attention because the investigator's report concluded that the complainant (Flores–Miranda) had no interest in proceeding and he (Zapata) had no other incriminating information available to him at that time. He was moreover, entitled to rely, at least to some extent, on the work of his predecessors and subordinates.[2] *See Southard,* 114 F.3d at 552–53; *Jones v. Wellham,* 104 F.3d 620, 626–27 (4th Cir.1997); *Pacelli v. deVito,* 972 F.2d 871, 878 (7th Cir.1992). On the other hand, Camilo–Robles counters, also with a measure of evidentiary support, that Díaz–Martínez's idiosyncrasies were well-known throughout the constabulary; that Zapata, particularly, had enough knowledge (however acquired) to

---

1. This opportunity arose in the following manner. On September 5, 1993 Díaz–Martínez allegedly assaulted his former landlord, Luis Flores–Miranda, while brandishing a pistol and threatening to kill. This fracas precipitated an administrative complaint. The ensuing internal investigation culminated in a recommendation that the complaint be dropped because the allegations had not been proven (due to Flores–Miranda's unwillingness to pursue the matter). Upon taking office, Zapata reviewed the file and accepted

the dismissal recommendation, opting to take no action against Díaz–Martínez.

2. It is unrealistic to expect supervisors to reinvent the wheel on every action taken by their predecessors or subordinates. *See Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir.1992). For bureaucratic structures (or any other form of social organization) to function, the ability to delegate responsibility and to trust the judgments of others is essential.

create a duty to probe further and to question the actions of others; that he acted recklessly in terminating the investigation into the Flores–Miranda episode;[3] that the powers of his position were such that he could have acted even without a formal complaint; and that the slightest effort on his part would have uncovered easily available information (e.g., the truth about Díaz–Martínez's role in the Barbosa Housing Project shootings and the fact that Flores–Miranda declined to press his complaint mainly because he feared Díaz–Martínez) that would have led any responsible supervisor to take corrective action. The facts that Camilo–Robles marshals, *if known to Zapata,* might well justify a finding of deliberate indifference. *See, e.g., Andrews v. Fowler,* 98 F.3d 1069, 1078 (8th Cir.1996) (concluding that question of fact as to deliberate indifference existed where supervisor knew of subordinate's prior misdeeds but did not take timely action either to discipline or investigate); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 566 (1st Cir.1989) (upholding a finding of supervisory liability when there was evidence that the defendant had failed "to identify and take remedial action" concerning his subordinate, and had maintained a "grossly deficient" disciplinary system).

■ We believe that the nature of the parties' debate indicates the substantial extent to which it is fact-dependent. Given the brevity of Zapata's service as Assis-

tant Superintendent, the reasonableness of his actions hinges largely on what he knew and when he knew it concerning subjects such as Díaz–Martínez's history and the status of ongoing investigations involving that troubled officer. *See, e.g., Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994) (stating that documented widespread abuses put supervisors on notice that they may be liable for subordinate's future misconduct); *cf. Bryan County,* 520 U.S. at 411–12, 117 S.Ct. 1382 (recognizing, in the negligent hiring context, that a municipality may be liable if an applicant's background suggested that he would be very likely, if hired, to commit specific constitutional violations). Despite the terseness of the district court's order, we are confident that it analyzed the case in this manner and thus perceived Zapata's claim to qualified immunity to turn upon disputed questions of material fact. Consequently, the court's denial of qualified immunity is not reviewable on an interlocutory appeal. *See Johnson,* 515 U.S. at 313, 319–20, 115 S.Ct. 2151; *Diaz,* 112 F.3d at 4–5; *Stella,* 63 F.3d at 75–77.

We need go no further.[4] In this instance, the state of the record, the standards for summary judgment, and the fact-intensive nature of derivative tort liability analysis all coalesce to bring this case squarely into the *Johnson* realm. Hence, we dismiss Zapata's appeal, with-

---

3. In this context, Camilo–Robles cites two provisions of the Puerto Rico Police Department's guidelines governing administrative investigations. The first provides that "the withdrawal of complaints must be observed cautiously and suspiciously," and specifically admonishes that "[l]ack of interest by complainant" does not automatically require dropping the investigation. The second provision holds that "[t]he investigating officer shall take into account the personnel background of the defendant when analyzing the evidence compiled on the investigative file related to the complaint filed against the officer." Although this latter proviso addresses investigations performed at the area level, the guidelines explicitly incorporate the described procedure at the Assistant Superintendent level.

4. Zapata also argues that because Díaz–Martínez was not directly in his chain of command, he could not have caused the harm that befell Camilo–Robles. This argument is sophistic. Public institutions have complex structures in which power and responsibilities often are compartmentalized into different departments in order to create efficiency and accountability through checks and balances. Thus, supervisory authority exists horizontally as well as vertically. For these reasons, we rejected a strikingly similar argument advanced by another police defendant in this case, *see Camilo–Robles I,* 151 F.3d at 14 (discussing defendant Díaz–Pagán), and Zapata has proffered nothing that impels us to revisit that determination.

out prejudice, for want of appellate jurisdiction. This determination leaves open, of course, the ultimate resolution of the qualified immunity issue. *See Behrens,* 516 U.S. at 306–07, 116 S.Ct. 834; *Camilo–Robles I,* 151 F.3d at 9; *Vazquez Rios v. Hernandez Colon,* 819 F.2d 319, 329 (1st Cir.1987).

*Appeal dismissed. Costs to appellee.*