MARY JANE CLANCY *vs.* WILLIAM McCABE.

No. 01-P-806.

Suffolk. December 18, 2002. - July 8, 2003.

Present: BROWN, SMITH, & KAFKER, JJ.

Further appellate review granted, 440 Mass. 1101 (2003).

*Practice, Civil,* Interlocutory appeal. *Civil Rights,* Supervisory liability, Immunity of public official. *Public Officer.*

Discussion of the doctrines of supervisory liability [502-504] and qualified immunity [504-506] under 42 U.S.C. § 1983 (2000).

In a proceeding arising out of misconduct by a former State trooper in which the plaintiff claimed that the defendant, a former Commissioner of Public Safety, violated her civil rights under 42 U.S.C. § 1983 (2000) in his individual capacity by not terminating the State trooper after he learned of the State trooper's abusive behavior toward other female motorists and by failing to monitor his performance after his return from suspension, the judge properly denied the defendant's motion for summary judgment where, absent a showing that the defendant's supervisory conduct was objectively reasonable in the circumstances, the defendant was not entitled to qualified immunity. [506-512]

CIVIL ACTION commenced in the Superior Court Department on November 22, 1995.

The case was heard by *Mitchell J. Sikora,* J., on a motion for summary judgment.

*Michelle A. Kaczynski,* Assistant Attorney General, for Commissioner of Public Safety.

*Michael J. Traft (James E. Riley, Jr., & Rebecca L. Andrews* with him) for the plaintiff.

BROWN, J. This is an interlocutory appeal by William McCabe, a former Commissioner of Public Safety, from the denial of his motion for summary judgment.[1] The matter arises out of

---

[1]Although an order denying a motion for summary judgment is an interlocutory order and is generally not appealable, here the appeal involves the denial of an immunity claim, which is immediately appealable. See *Johnson* v.

misconduct by Ramon Rivera, a former Massachusetts State trooper.[2] The plaintiff, Mary Jane Clancy, claims that McCabe violated her civil rights under 42 U.S.C. § 1983 (2000), in his individual capacity, by not terminating Rivera after he learned of Rivera's abusive behavior toward other female motorists and by failing to monitor Rivera's performance after his return from suspension.[3] In her claim for supervisory liability, the plaintiff contends that McCabe's conduct amounted to "deliberate indifference" to his supervisory responsibilities over Rivera such that her constitutional rights were violated. See *Figueroa-Torres* v. *Toledo-Davila*, 232 F.3d 270, 279 (1st Cir. 2000).[4]

In defense, McCabe asserts a claim of qualified immunity; the crux of his argument on appeal is that the judge's conclusion that there was a survivable genuine issue of material fact as to whether he was "deliberately indifferent" to Rivera's conduct was error because McCabe's actions in redressing Rivera's conduct were "objectively reasonable" in the circumstances and therefore entitled him to qualified immunity.[5] See *Saucier* v. *Katz*, 533 U.S. 194, 200-201 (2001). He also contends

---

*Jones*, 515 U.S. 304, 309-312 (1996); *Breault* v. *Chairman of the Bd. of Fire Commrs. of Springfield*, 401 Mass. 26, 31 (1987), cert. denied sub nom. *Forastiere* v. *Breault*, 485 U.S. 906 (1988).

[2]During his tenure as Commissioner of Public Safety (1987-1992), McCabe also held the title of superintendent of the State police. That position placed McCabe in direct command of State police personnel.

[3]Prior to the incident involving Clancy, Rivera had been investigated for four other acts of misconduct toward female motorists during traffic stops. McCabe was the Commissioner of Public Safety during the first four incidents and had actual knowledge of those incidents, though he did not learn of the first three until an investigation by the office of internal affairs was completed on the fourth complaint.

[4]A showing of "deliberate indifference" is required to hold an official liable on the merits of a supervisory liability claim. *Figueroa-Torres* v. *Toledo-Davila*, 232 F.3d at 279.

[5]The "deliberate indifference" standard is a "subjective" standard used to establish the "objective" legal standard of "reasonableness." It is used not only in determining the merits of a supervisory liability claim, but also to determine whether qualified immunity exists. See *Thompson* v. *Upshur County, Tex.*, 245 F.3d 447, 459-460 (5th Cir. 2001).

Qualified immunity is both a procedural privilege from suit and an affirmative defense from liability on a substantive claim at trial. See *Saucier* v. *Katz*, 533 U.S. 194, 200-201 (2001). See also *Camilo-Robles* v. *Hoyos*, 151 F.3d 1, 9 (1st Cir. 1998).

there was no showing sufficient to support the "affirmative causal link" between his conduct and the plaintiff's injuries necessary to establish a claim on the merits in a supervisory liability action. See *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989).

It is necessary to set out the underlying facts in some detail. McCabe was appointed commissioner in January, 1987. Rivera had been a trooper since 1985. The first complaint against Rivera alleging inappropriate conduct toward a female motorist was in November of 1987 by H.[6] It was examined by two investigators from the office of internal affairs. They found H to be "sincere and honest." H's complaint precipitated a fuller investigation into Rivera's conduct and led to the discovery of three prior incidents[7] and the uncovering of widespread rumors of other incidents involving Rivera and female motorists. The complainants' allegations ranged from his asking female motorists to go out for drinks, to inappropriate touching, to detention of female motorists for up to an hour, and to threats against a female motorist.

The investigators presented their findings in a report to McCabe. It stated that Rivera's actions were "totally inappropriate and unprofessional" and that Rivera had "at the very least an unstable, emotional attitude in dealing with female motorists." It concluded that Rivera was "unfit to carry on the affairs of his office in a professional and creditable manner" and recommended that he be "dealt with in a manner that w[ould] show the victims of these incidents and the general public that the Massachusetts State Police will not tolerate. these types of activities." As was the practice, the report was given to the deputy superintendent of the State police, then Thomas Fitzgerald, for him to make a recommendation regarding the type of disciplinary action to be taken. Fitzgerald reviewed the report and forwarded it to McCabe with his recommendation that Rivera be terminated.[8] McCabe reviewed the report with Fitzgerald and agreed with that recommendation. Rivera was formally

---

[6]We use pseudonyms for names of the complainants.

[7]The dates of the incidents were as follows: with M, on October 28, 1987; with P, on May 25, 1987; and with W, sometime in July, 1987.

[8]One of the investigators had also recommended that Rivera be terminated.

charged with "conduct unbecoming an officer" arising from the first four incidents.[9] McCabe had Fitzgerald draft a letter to Rivera, giving Rivera the option of resigning or going to a court-martial to face the charges.[10] Rivera then conferred with union counsel, who brokered an agreement with McCabe that resulted in an alternative solution: to wit, Rivera was suspended for six months and ordered to report to the State police stress unit.[11]

McCabe asserts that his acceptance of the agreement was not in acquiescence to the threat of liability, but was a result of a genuine interest in balancing the needs of the department with the needs of the public and his individual personnel. The record, however, indicates that McCabe acquiesced to the agreement because Rivera's counsel threatened to bring a racial discrimination suit against the department of State police on the ground that it had never terminated a white officer for "conduct unbecoming an officer."[12]

As a condition, Rivera agreed, upon his return from suspension, to report to the stress unit for a period of time to be determined by Deputy Superintendent Fitzgerald.[13] Rivera was suspended in August, 1988, and returned to work in January, 1989, with no restrictions on his road duties, no further discipline, no evaluation of his treatment from the stress unit, and no measures instituted to monitor his behavior.

In November, 1992, almost four years after Rivera's suspen-

---

[9]Eleven charges spanning twenty-five counts were lodged.

[10]A court-martial allows an accused officer to go before a three-member trial board to contest the charges. If found guilty by at least two members of the board, the officer can be terminated from employment. Because of Rivera's years of service, McCabe did not have the power to discharge him directly; to be formally discharged, Rivera had to be found guilty by the trial board. Rivera could not go before the trial board without referral from McCabe.

[11]The stress unit is an intradepartmental counseling unit. Its primary role is crisis intervention. At the time of the incident against H, the appointed counselors were not required to have any specific training or qualifications, and counseling was usually imposed pursuant to disciplinary measures.

[12]McCabe's review of the department's disciplinary reports confirmed there had not been a single case in thirty years in which a white officer was fired for "conduct unbecoming an officer."

[13]The record does not indicate the length of time Rivera was mandated to attend the stress unit.

sion was imposed, Clancy filed a complaint alleging he had strip searched her and made lewd and suggestive comments to her during the course of a traffic stop.[14] The record reveals that Rivera threatened Clancy with physical harm if she told anyone about the incident. Criminal charges against Rivera ensued. Clancy then filed this action against McCabe.[15]

A. *Substantive law.* The doctrines of supervisory liability and qualified immunity often overlap significantly. In analyzing Mc-Cabe's claim for qualified immunity, we use an analytical roadmap to plot the complex paths leading to the intersection of the doctrine of supervisory liability (the plaintiff's substantive claim) and the doctrine of qualified immunity (the defendant's affirmative defense and pretrial procedural exception, see note 5, *supra*). Thus, in considering a defendant's pretrial procedural claim of immunity, since the claim is predicated on an assertion of "objective reasonableness," a court's analysis necessarily entails an inquiry into the merits of the plaintiff's (substantive) supervisory liability claim. See *Camilo-Robles* v. *Hoyos*, 151 F.3d 1, 7 (1st Cir. 1988) (stating that "[t]he inquiry into qualified immunity is separate and distinct from the inquiry into the merits. . . . In some circumstances, however, these inquiries overlap. . . . [D]iscerning whether a particular appellant's behavior passes the context-specific test of objective legal reasonableness to some extent collapses the separate 'qualified immunity' and [supervisory liability] 'merits' inquiries into a single analytic unit."). We take each path separately (providing various analytical signposts along the way) and then highlight the crossroads at the end.

1. *Supervisory liability under § 1983.* Section 1983 of Title 42 of the United States Code provides a cause of action against a governmental official who, acting under color of law, deprives an individual of rights or privileges secured under the United

---

[14]With his hand on his gun, Rivera ordered Clancy to take off all her clothes. He then ordered her to open her vagina, allegedly to check for drugs.

[15]Rivera was convicted on three indictments associated with the Clancy incident: open and gross lewdness and lascivious behavior, attempted extortion, and violation of Clancy's State civil rights. See *Commonwealth* v. *Rivera*, 44 Mass. App. Ct. 1118 (1998).

States Constitution or the Federal laws.[16] See *Diaz* v. *Martinez,* 112 F.3d 1, 3 (1st Cir. 1997). A § 1983 cause of action may also in certain circumstances lie against a governmental official's supervisor for the acts or misdeeds of the subordinate. See *Shaw* v. *Shroud,* 13 F.3d 791, 798 (4th Cir. 1994). The doctrine of supervisory liability, however, is distinct from the doctrine of respondent superior. *Ibid.* A supervisor can only be liable under the doctrine of supervisory liability for acts or omissions that cause a constitutional deprivation. *Ibid.* Moreover, a supervisor is not liable merely because the subordinate commits an unconstitutional act. See *Febus-Rodriguez* v. *Betancourt-Lebron,* 14 F.3d 87, 92 (1st Cir. 1994). See also *Poe* v. *Leonard,* 282 F.3d 123, 140 (2d Cir. 2002). A showing of "deliberate indifference" to the subordinate's unconstitutional behavior or of "reckless or callous indifference to the constitutional rights of others" is required before the supervisor's liability can attach. See *Gutierrez-Rodriguez* v. *Cartagena,* 882 F.2d at 562; *Camilo-Robles* v. *Hoyos,* 151 F.3d at 7. "[A] supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts . . . ." *Poe* v. *Leonard,* 282 F.3d at 140. Generally, proof of more than a single instance of a lack of supervision causing a violation of a constitutional right is required before such conduct can be deemed "deliberate indifference." *Thompson* v. *Upshur County, Tex.,* 245 F.3d 447, 459 (5th Cir. 2001). "The plaintiff must generally demonstrate at least a pattern of similar violations." *Ibid.*

The Federal circuit courts have employed various analytical tests to address a plaintiff's claim for supervisory liability.[17] Recognizing the extreme difficulty in assessing claims for

---

[16]McCabe does not contest on appeal that Rivera's conduct occurred while acting under color of law.

[17]See *Gutierrez-Rodriguez* v. *Cartagena,* 882 F.2d at 561-562 (1st Cir.); *Poe* v. *Leonard,* 282 F.3d at 140-141 (2d Cir.); *Shaw* v. *Shroud,* 13 F.3d at 799 (4th Cir.); *Thompson* v. *Upshur County, Tex.,* 245 F.3d at 459 (5th Cir.); *Woodward* v. *Worland,* 977 F.2d 1392, 1399-1400 (10th Cir. 1992); *Braddy* v. *Florida Dept. of Labor & Employment Sec.,* 133 F.3d 797, 801-802 (11th Cir. 1998); *Haynesworth* v. *Miller,* 820 F.2d 1245, 1260-1262 (D.C. Cir. 1987).

supervisory liability and the inherent need for a practicable analytical framework to facilitate these endeavors, we will use, in applying the principles applicable to such claims, see, e.g., *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d at 562, 573-574; *Camilo-Robles* v. *Hoyos*, 151 F.3d at 6-7, a three-step analysis similar to that utilized by the United States Court of Appeals for the Fourth Circuit in *Shaw* v. *Shroud*, 13 F.3d at 799.[18] See *Poe* v. *Leonard*, 282 F.3d at 140-142. In order for a plaintiff to succeed on a § 1983 supervisory liability claim, the plaintiff must show that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate that it amounted to "deliberate indifference" or "tacit authorization" of the subordinate's behavior; and (3) there was an affirmative causal link between the supervisor's action or inaction and the particular constitutional injury suffered by the plaintiff. See *Shaw* v. *Stroud, supra*; *Poe* v. *Leonard, supra*. See also *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d at 562.

2. *Immunity under § 1983.* In response to Clancy's claim for supervisory liability, McCabe asserted a right to qualified immunity. See *Saucier* v. *Katz*, 533 U.S. at 200.

Qualified immunity is an affirmative defense that shields government officials who are performing discretionary functions from civil lawsuits in their individual capacity if their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known. See *Mitchell* v. *Forsyth*, 472 U.S. 511, 517 (1985); *Saucier* v. *Katz*, 533 U.S. at 200-201. Compare *Breault* v. *Chairman of the Bd. of Fire Commrs. of Springfield*, 401 Mass. 26, 31 (1987), cert. denied sub nom. *Forastiere* v. *Breault*, 485 U.S. 906 (1988); *Howcroft* v. *Peabody*, 51 Mass. App. Ct. 573, 595 (2001) ("qualified immunity principles . . . under § 1983 apply equally to claims under [the Massachusetts Civil Rights Act]"). "On a motion for summary judgment, 'the relevant question is

---

[18]As other circuits in using a two-step test seem to conflate the requirement of "notice" with the requirement of "cause" or with the requirements of "deliberate indifference," we find a three-prong test to be more precise.

whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.' " *Febus-Rodriguez* v. *Betancourt-Lebron*, 14 F.3d at 91, quoting from *McBride* v. *Taylor*, 924 F.2d 386, 389 (1st Cir. 1991).

After an immunity claim has been asserted, the court must first determine whether the plaintiff has alleged a violation of a "clearly established" constitutional right.[19] *Saucier* v. *Katz*, 533 U.S. at 201. If such a violation is found, the court then assesses whether the defendant's conduct was "objectively reasonable," *Thompson* v. *Upshur County, Tex.*, 245 F.3d at 457, in light of the clearly established law at the time of the constitutional deprivation. See *Camilo-Robles* v. *Hoyos*, 151 F.3d at 6.

As stated above, the objective reasonableness inquiry involves an examination of the facts uncovered from an inquiry into the "deliberate indifference" element of the substantive claim. See *Thompson* v. *Upshur County, Tex.*, 245 F.3d at 459-460 ("[e]xamples of behavior that does (and does not) constitute deliberate indifference are relevant in assessing the scope of clearly established law and, therefore, are relevant in determining whether the defendants' actions were objectively reasonable"). This analysis provides for an assessment of the scope of the "clearly established" right or constitutional law allegedly violated, and ultimately lends itself to evaluating the reasonableness of the supervisory official's conduct. See *Camilo-Robles* v. *Hoyos*, 151 F.3d at 6-8. In short, the determination of a supervisory official's pretrial immunity claim of objective reasonableness necessarily involves an analysis of the merits of

---

[19]A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987). "[T]he 'clearly established [right]' prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context. . . . In other words, for a supervisor to be liable there must be a bifurcated 'clearly established' inquiry — one branch [1] probing the underlying violation, and the other [2] probing the supervisor's potential liability." *Camilo-Robles* v. *Hoyos*, 151 F.3d at 5-6.

the substantive supervisory liability claim, including the element of deliberate indifference.

B. *Analysis*. McCabe contends he was entitled to immunity because his conduct — the measures he took to redress Rivera's misconduct — was "objectively reasonable" in the circumstances. The qualified immunity test is a two-step inquiry. See *Saucier* v. *Katz*, 533 U.S. at 201-202.

1. *Whether constitutional violation clearly established*. We address the first prong of the qualified immunity test (whether the rights violated by the defendant were "clearly established") in summary fashion, as this issue is not in serious dispute.

It is undisputed that prior to the time of the incident such acts as Rivera's strip-search of the victim, his propositioning of her for sex, and his threats to her were "clearly established" constitutional violations that McCabe knew or should have known he could be liable for in his supervisory capacity.[20] The record persuasively establishes that McCabe knew or should have known, based on Rivera's past conduct, that Rivera's conduct posed a " 'pervasive and unreasonable risk' of constitutional injuries to citizens like the plaintiff." *Shaw* v. *Shroud*, 13 F.3d at 799, 802. See *Diaz* v. *Martinez*, 112 F.3d at 3-4; *Camilo-Robles* v. *Hoyos*, 151 F.3d at 6. See also *Dobos* v. *Driscoll*, 404 Mass. 634, 648-650, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989) (police supervisors who had notice of subordinate police officer's past culpable conduct and failed to prevent its recurrence by removing officer from highway duty could be found liable under § 1983).

2. *Objective reasonableness*. We now move to the second prong of the immunity test, i.e., whether McCabe's conduct was reasonable in the circumstances. As stated above, the determination of "objective reasonableness" entails an inquiry into the merits of a plaintiff's supervisory liability claim. Thus, whether McCabe's conduct was objectively reasonable is predicated on (1) whether he had actual or constructive knowledge that Rivera posed a "pervasive and unreasonable risk" of a constitutional injury to a female motorist; (2) whether his response to that knowledge was so inadequate as to have amounted to "deliber-

---

[20]See note 19, *supra*.

ate indifference" or "tacit authorization" of Rivera's unconstitutional behavior; and (3) whether there was an affirmative causal link between McCabe's inaction and Clancy's constitutional injury. *Shaw* v. *Stroud*, 13 F.3d at 799.

(a) *Notice.* The first element (notice) is not at issue. McCabe acknowledged that he had actual knowledge of Rivera's behavior after receiving the investigators' report. Compare *Dobbs* v. *Driscoll*, 404 Mass. at 648-649.

(b) *Deliberate indifference.* "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.' " *Shaw* v. *Shroud*, 13 F.3d at 799, quoting from *Slakan* v. *Porter*, 737 F.2d 368, 373 (4th Cir. 1984). The supervisor must have had "the power and authority to alleviate [the violation]" and would have acted but for his wilful blindness or deliberate indifference. *Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). See and compare *Morrison* v. *Northern Essex Community College*, 56 Mass. App. Ct. 784, 798-799 (2002). "Gross negligence can signify deliberate indifference and serve as a basis for supervisory liability if it is causally connected to the actions that work the direct constitutional injury." *Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d at 582. Based on this summary judgment record, taken in the light most favorable to Clancy, we think that a sufficient showing has been made of the factors for determining deliberate indifference to defeat McCabe's motion for summary judgment. See *Shaw* v. *Shroud*, 13 F.3d at 799; *Camilo-Robles* v. *Hoyos*, 151 F.3d at 7.

We next determine whether the evidence could establish that McCabe failed to take "easily available measures to address the risk" that Rivera posed. *Camilo-Robles* v. *Hoyos*, 151 F.3d at 7. Put another way, the issue is whether the measures taken were adequate, in light of the known risks Rivera posed to female motorists, to prevent recurrence of the constitutional violations or misconduct. See *Shaw* v. *Shroud*, 13 F.3d at 799. See also *Dobos* v. *Driscoll*, 404 Mass. at 648-649 (State police supervisors found liable for allowing trooper to return to highway duty and thus failing to prevent recurrence of misconduct); *Diaz* v. *Martinez*, 112 F.3d at 4 (finding police supervisor was not entitled to immunity, because of his failure to take adequate

remedial actions concerning rogue police officer, which could be found to constitute deliberate indifference).

Viewing the evidence in the light most favorable to Clancy, it can be reasonably inferred that McCabe's supervisory response to Rivera's behavior was grossly inadequate. Before the incident against Clancy occurred, McCabe had actual knowledge of four prior incidents of Rivera's abusive behavior[21] and of his predilections for abuse of female motorists. After he received the investigators' report, McCabe learned that Rivera had been orally warned several times by lower supervisors prior to his misconduct against H. Even after those warnings, Rivera continued his misconduct, eventually precipitating the incident against H. Two high-ranking officials recommended that Rivera be terminated, and McCabe initially agreed with that recommendation. However, instead of initiating termination proceedings, McCabe agreed to an arrangement that resulted in Rivera receiving a six-month suspension and referral to the stress unit. The record supports an inference that McCabe agreed to accept this arrangement in the face of a threat of a racial discrimination suit. Although that may have been a legitimate concern, it arguably did not warrant McCabe's overlooking "a clear risk of future unlawful action by a lower-echelon actor over whom he had some degree of control." *Camilo-Robles* v. *Zapata*, 175 F.3d 41, 44 (1st Cir. 1999).

Although McCabe took some action against Rivera, in light of what he knew, we think that a sufficient showing has been made to support the plaintiff's claim that the action taken amounted to tacit condonation of Rivera's behavior. It thus can be fairly inferred from the summary judgment record that McCabe was "gross[ly] negligen[t]" in his supervisory duty to protect female motorists from the known risks Rivera posed to them. See *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d at 562; *Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d at 582. After his six-month suspension, Rivera was placed back on patrol

---

[21]Contrary to McCabe's contentions, we think these incidents could reasonably be found to establish a pattern of similar behavior sufficient to put him on notice of the risk Rivera posed. See *Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d at 582. See also *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d at 562-564.

with no restrictions on his activities, and with no measures implemented to monitor or oversee his future behavior toward female motorists. Although McCabe ordered Rivera to attend counseling at the stress unit, there is no showing that the stress unit could or did adequately address Rivera's specific condition.[22] There is no showing that McCabe or any of his subordinates evaluated Rivera's treatment from the stress unit to determine whether Rivera's behavior had been corrected.

In these circumstances, it may be fairly inferred that McCabe should reasonably have appreciated that there was an unreasonable risk that Rivera would again abridge rights of female motorists. McCabe's failure to do more provides support for Clancy's assertion that he was indifferent to persons such as the plaintiff or that he "acquiesced in the constitutionally offensive conduct of his subordinate[]." *Slakan* v. *Porter*, 737 F.2d at 373.[23]

In addition, the plaintiff has presented the expert opinion of Lou Reiter, former deputy police commissioner of the Los Angeles police department, that McCabe's conduct showed deliberate indifference to the rights of female motorists by not properly redressing Rivera's known predilections.[24] The record supports an inference that McCabe was more concerned with union relations than with ensuring the safety of female motorists from the risks posed by Rivera.

---

[22]Indeed, McCabe apparently was skeptical about the efficacy of the "stress unit" counseling program. He acknowledged that he believed the stress unit would outsource Rivera to other professionals because he did not believe the stress unit was an adequate means to address Rivera's behavior.

[23]McCabe argues that because too much time elapsed between Rivera's suspension and his misconduct against Clancy, it is not reasonable to infer that he should have known that Rivera would violate the rights of female motorists again. We think a fact finder could infer that, in the circumstances presented here, it was just a matter of time before Rivera would strike again. Moreover, aside from the investigation into the four complaints, there has been no showing that McCabe conducted a thorough investigation into Rivera's motor vehicle stops of female motorists before or after the incident with H to determine whether Rivera's conduct went beyond the scope of that incident. The widespread rumors also permit an inference that McCabe should have known there was an unreasonable risk Rivera's misconduct would continue.

[24]Reiter opined that a reasonable police supervisor would have conducted a fuller investigation of Rivera's prior motor vehicle stops of female motorists to assess the likelihood of any further misconduct by Rivera.

Based on the foregoing, we conclude that, for summary judgment purposes, Clancy has sufficiently established that McCabe failed to take readily available measures necessary to address known risks Rivera posed to female motorists. Such a showing, viewed in the light most favorable to Clancy, could fairly lead a fact finder to conclude that McCabe's actions were so inadequate that his conduct amounted to deliberate indifference or reckless disregard for the rights of motorists like Clancy. See *Camilo-Robles* v. *Hoyos,* 151 F.3d at 7-8, 10-11 ("failed to take readily apparent steps to alleviate [the] risk").

(c) *Causal connection.* A sufficient showing of deliberate indifference does not end the inquiry. "[A] suitor also must show causation." *Camilo-Robles* v. *Hoyos,* 151 F.3d at 7. See *Figueroa-Torres* v. *Toledo-Davila,* 232 F.3d at 279. "There must be an 'affirmative link' between the supervisory official's acts or omissions and his subordinate's violation of the plaintiff's constitutional right." *Febus-Rodriguez* v. *Betancourt-Lebron,* 14 F.3d at 92. *Gutierrez-Rodriguez* v. *Cartagena,* 882 F.2d at 562.

"[P]roof of causation may be direct . . . [or] may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." *Shaw* v. *Shroud,* 13 F.3d at 799, quoting from *Slakan* v. *Porter,* 737 F.2d at 376. Thus, on a claim that a supervisory official indirectly caused a constitutional injury, the question turns on whether the plaintiff's "injuries were a natural and foreseeable consequence of the supervisor['s] indifference." *Slakan* v. *Porter,* 737 F.2d at 376. To establish cause, "the acts or omissions of the supervisor[] must have 'played a substantial part in bringing about or actually causing the injury or damage, and . . . the injury or damage [must have been] either a direct result or a reasonable probable consequence of the act or omission.' " *Gutierrez-Rodriguez* v. *Cartagena,* 882 F.2d at 569 (citation omitted). For instance, "[a] causal link may . . . be forged if there exists a known history of [a subordinate's] widespread abuse sufficient to alert a supervisor to ongoing violations . . . [and] the supervisor . . . fails to take [adequate] corrective action, [such as] by . . . closer oversight . . . ." *Maldonado-Denis* v. *Castillo-Rodriguez,* 23 F.3d at 582. An affirmative or causal link can be

established also by showing that the supervisor indirectly participated in the subordinate's misdeeds, for example, "if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct," or if the supervisor's conduct amounted to "gross negligence." *Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d at 582.[25]

Viewing the materials in the record in the light most favorable to the plaintiff, we conclude that McCabe's acts and omissions could reasonably have played a substantial part in bringing about Clancy's injuries and that her injuries were a reasonable probable consequence of those acts and omissions. McCabe had exclusive authority over discipline within the Massachusetts State police department. McCabe was aware of Rivera's predilections toward female motorists to the extent that he initially agreed to discharge him. Threatened with a racial discrimination suit, he subsequently agreed to suspend him for six months and order him, at the end of the six months, upon his reactivation to duty as a highway patrol officer, to report for counseling to a stress unit that arguably was incapable of dealing with Rivera's problem.

At the end of the six-month suspension, other than the requirement that Rivera report to the stress unit, no restrictions were placed on him or the duties he was to perform. Further, although Deputy Superintendent Fitzgerald was to determine the period of time Rivera was to report for counseling, McCabe did not monitor Rivera's progress or require an evaluation of him prior to his ceasing participation in the stress program. Instead, he allowed Rivera to continue to perform duties as a highway patrol officer with no evaluation of his condition, no assessment of his potential continuing threat to female motorists, no restrictions, and no measures to monitor his behavior. As a result of these acts and omissions, McCabe tacitly or otherwise permitted Rivera to continue his illegal and improper conduct against female motorists. There thus has been a sufficient showing on this record to establish an affirmative causal

---

[25]Gross negligence amounting to deliberate indifference demonstrates that the supervisor's conduct condoned or tacitly authorized his subordinate's conduct. See *Aponte Matos* v. *Toledo Davila*, 135 F.3d 182, 192 (1st Cir. 1998); *Camilo-Robles* v. *Zapata*, 175 F.3d 41, 44 (1st Cir. 1999).

link between McCabe's acts and omissions and Clancy's injuries.

*Conclusion.* Based on the foregoing, we conclude for purposes of summary judgment that McCabe has not shown that his conduct was objectively reasonable in the circumstances and that he therefore is not entitled to qualified immunity.

The order denying the defendant's motion for summary judgment is affirmed.

*So ordered.*